United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 8, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-11262

JAMES EUGENE BIGBY,

Petitioner-Appellant,

versus

DOUG DRETKE, Director, Texas
Department of Criminal Justice, Institutional
Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The opinion reported at 340 F.3d 259 (5th Cir. 2003) is withdrawn and the opinion below is

substituted therefor.

Petitioner-Appellant, Gary Eugene Bigby ("Bigby"), appeals the district court's denial of his

Petition for Writ of Habeas Corpus regarding his claim that, by declining to recuse himself after Bigby

assaulted him, the trial judge denied Bigby his constitutional right to due process. Prominent among

other claims raised by Bigby is his Penry claim that punishment phase jury instructions prevented the

jury from acting upon mitigating evidence submitted in his behalf. For the reasons assigned herein, we affirm the conviction, reverse the district court's denial of a COA on Bigby's Penry claim, grant the COA, vacate Bigby's sentence, and remand to the district court with instructions.

## FACTUAL AND PROCEDURAL HISTORY

During the early morning hours of December 24, 1987, Grace Kehler returned from work to the trailer home she shared with Michael Trekell and their infant son, Jayson Kehler. Upon entering the trailer, Kehler found Michael Trekell's body on the kitchen floor. Initially thinking Trekell was unconscious, Kehler phoned "9-1-1" for assistance. In response to questions asked by the 9-1-1 operator, Kehler remembered that Trekell was caring for Jayson. She then began looking for her son and discovered him lying dead in a face down position in a sink full of water. When questioned as to possible suspects by the police, Kehler implicated Bigby. She noted that there were three steaks upon the table that were not there when she left for work and recalled frequent visits by Bigby at the residence.

Arlington Police Officer James Greenwell arrived at the scene at approximately 5:10 a.m. to perform various duties as a crime scene investigator. He took photos, developed a diagram of the layout of the trailer, performed a gunshot residue test on both the infant and Trekell, and obtained postmortem fingerprints from Trekell. Officer Greenwell also collected beer cans and a wine cooler bottle from the trash which he thereafter had checked for fingerprints.

Dr. Charles Harvey, Deputy Tarrant County Medical Examiner, performed the autopsies. Dr. Harvey ruled that the manner of both deaths was homicide. He determined that the cause of Trekell's death was craniocerebral trauma due to a gunshot wound by a .357 Magnum revolver. He determined that the infant died as the result of drowning.

2

On December 26, 1987, Fort Worth Police Detective Larry Ansley was summoned to act as a negotiator to defuse a man's standoff with police at a Tarrant County motel. The person inside the motel room was Bigby. Shortly after Detective Ansley made contact, Bigby cracked the door and said to the detective, "I know that I am guilty and so do you." Bigby surrendered without incident, and was taken to Fort Worth's John Peter Smith Hospital.

The following morning, Fort Worth Police Homicide Detective Curtis D. Brannan interviewed Bigby after advising him of his <u>Miranda</u> rights. At about 3:00 a.m. on December 27, 1987, Bigby provided the police a written statement in which he confessed to killing Trekell and the infant. The fingerprints found on the wine cooler bottle at the crime scene were later matched to the fingerprints of Bigby.

Bigby was tried for capital murder. During a trial recess, Bigby approached the unoccupied bench of Judge Don Leonard ("Judge Leonard"), found a gun, and took it. In an apparent attempt to escape, Bigby proceeded to Judge Leonard's chambers and pointed the gun to the judge's head stating: "Let's go." He was ultimately subdued. Bigby's counsel then moved for a mistrial, which the judge denied.

In response to Bigby's motion for Judge Leonard's recusal, the matter was referred to the presiding administrative judge, who held a hearing. During the hearing, Judge Leonard testified that Bigby's assault had not prejudiced or biased him toward the defendant. After cross-examination, the presiding judge concluded that Judge Leonard did not have to recuse himself, and the trial continued.

Upon the defense resting after the guilt/innocence phase of trial, Judge Leonard allowed the state, in its rebuttal, to introduce testimony about Bigby's attempted escape as evidence of his "consciousness of guilt" for the Trekell murders. After the trial was completed, a jury ultimately

3

rejected Bigby's asserted defense of insanity. Furthermore, they found him guilty of the offense of capital murder and imposed the death penalty. The trial court entered judgment on March 25, 1991, in conformity therewith.

The Texas Court of Criminal Appeals affirmed the conviction and death sentence on direct appeal, and the United States Supreme Court denied Bigby's petition for a writ of certiorari. Bigby v. State, 892 S.W.2d 864 (Tex. Crim. App. 1994), cert. denied, 515 U.S. 1162, 115 S. Ct. 2617, 132 L. Ed. 2d 860 (1995). Bigby then filed a state application for writ of habeas corpus, which the Texas Court of Criminal Appeals denied. Ex parte Bigby, No. 34-970 (Tex. Crim. App. filed Feb. 4, 1998).

On August 10, 1998, court-appointed counsel then filed a federal Petition for Writ of Habeas Corpus in the United States District Court for the Northern District of Texas, Fort Worth Division. Adopting the findings of United States Magistrate Judge Charles Bleil, the district court denied Bigby's Petition for Habeas Corpus on October 18, 1999. On December 7, 1999, however, the court granted Bigby a Certificate of Appealability ("COA") on the sole question of "[w]hether Petitioner was denied the right to a trial presided over by a fair and impartial judge after he assaulted the state trial judge." Thereafter, all issues in the petition were fully briefed and oral argument was held in November 2000. Because of developing case law regarding the Penry claim, i.e. Penry v. Johnson, 532 U.S. 782, 121 S. Ct. 1910 (2001) (Penry II) and Robertson v. Cockrell, 325 F.3d 243 (5th Cir. 2003), the parties have filed comprehensive supplemental briefing. We now address the COA granted issue and Bigby's remaining claims for which the district court did not grant a COA.

<u>DISCUSSION</u>

I.     Standard of Review

4

To obtain a COA, a petitioner must demonstrate "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 123 S. Ct. 1029, 1034 (2003). "Because the present case involves the death penalty, any doubts as to whether a COA should [be] issue[d] must be resolved in [the petitioner's] favor." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000). When determining if a petitioner is entitled to a COA, we must apply the "deference scheme laid out in 28 U.S.C. § 2254(d)." Moore, 225 F.3d at 501. Under this scheme, "we review pure questions of law and mixed questions of law and fact under § 2254(d)(1), and review questions of fact under § 2254(d)(2), provided that the state court adjudicated the claim on the merits." Id. at 501 (citation omitted).

Because Bigby's federal petition for habeas review was filed in 1998, we review it under the standards articulated in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See 28 U.S.C. § 2254. Under that statute, a federal court may only grant a state prisoner's application for a writ of habeas corpus if his incarceration was the product of a state court adjudication that "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). "A decision is contrary to clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts.'" Gardner v. Johnson, 247 F.3d 551, 557 (5th Cir. 2001) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). "'[I]f the state court identifies the correct governing legal principle . . . but unreasonably applies the principle to the facts of the

5

prisoner's case[,]'" the court's decision represents an unreasonable application of federal law. Id. (quoting Williams, 529 U.S. at 413). We presume that a state court's factual findings are correct and defer to them "unless they were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. (internal quotation marks and citation omitted); 28 U.S.C. § 2254(d)(2).

II.     Due Process: Fair Tribunal

While this case involves novel yet disturbing facts, the fundamental underlying policies and law that these facts implicate are much less unique. Stated succinctly, the cornerstone of the American judicial system is the right to a fair and impartial process. See, e.g., Bracy v. Gramley, 520 U.S. 899, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). Therefore, any judicial officer incapable of presiding in such a manner violates the due process rights of the party who suffers the resulting effects of that judicial officer's bias. See id.

"[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, [however,] not a uniform standard." Id. at 904. This floor "clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. at 905 (citation omitted). The crux of Bigby's habeas corpus complaint is that his assault of Judge Leonard created an impermissible bias that ultimately violated Bigby's clearly established constitutional right to a fair trial.

In response to Bigby's claim, the district court adopted the magistrate judge's Findings, Conclusions, and Recommendations and recognized that "bias by an adjudicator is not lightly established." Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1052 (5th Cir. 1997). This is true because, "[o]rdinarily, we presume that public officials have properly discharged their official duties."

6

Bracy, 520 U.S. at 909 (internal quotations marks and citations omitted). As such, the district court reasoned that Bigby had the burden to overcome "two strong presumptions: (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest." Valley, 118 F.3d at 1052-53.

We note that the United States Supreme Court has consistently enforced the basic right to due process and found that decision makers are constitutionally unacceptable when: (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints. Id.[1] To demonstrate such a due process violation and secure relief based thereon, Bigby was required to establish that a genuine question exists concerning Judge Leonard's impartiality. See Liteky v. United States, 510 U.S. 540, 552, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).[2] Moreover, adjudication before a biased trial judge falls within the "very limited class of

[1] See, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 824-25,106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986) (holding that the Justice's interest in the case was "direct, personal, substantial, [and] pecuniary" and concluding that his participation in the case "violated appellant's due process rights") (internal quotations and citation omitted) (alteration in original); Withrow v. Larkin, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) (reasoning that "experience teaches that the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable" in cases in which the judge "has been the target of personal abuse or criticism from the party before him") (citations omitted); In re Murchinson, 349 U.S. 133, 139, 75 S. Ct. 437, 71 L. Ed. 749 (1927) (holding that it was a violation of due process for one adjudicator to preside as the grand jury and judge for the same defendants).

[2] The Court clarified that an "extrajudicial source"in not the "*only* basis for establishing disqualifying bias or prejudice." Liteky, 510 U.S. at 551. It noted that "[a] favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." Id. (citations omitted). Writing separately to concur in the judgment, Justice Kennedy, with whom Justices Blackmun, Stevens, and Souter joined, agreed "with

cases" that represents a "structural" error subject to automatic reversal. <u>Neder v. United States</u>, 527 U.S. 1, 7-8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (internal quotation marks and citation omitted).

III.    Recusal After a Party Attacks the Judge

Bigby's assault of Judge Leonard and the due process violations alleged to have occurred on the subsequent failure to recuse him present a *res nova* issue within the Fifth Circuit. Nonetheless, persuasive authority from one of our sister circuits appears propitious to the instant inquiry. <u>See Wilks v. Israel</u>, 627 F.2d 32 (7th Cir. 1980).

In <u>Wilks</u>, the petitioner became agitated and angry with the judge and threw a stamping machine and microphone at him during a pretrial hearing. <u>Id.</u> at 36. When the petitioner was on the witness stand, but while the jury was not in the courtroom, he jumped from the chair and assaulted the trial judge. <u>Id.</u> While still outside of the jury's presence, the judge stated, "I am going to say it for the record, he is going away for so long they are going to forget that they ever knew him, and I want any reviewing court to know what my intentions are." <u>Id.</u> When his emotions subsided, the judge recanted from this position stating that he had had over sixty jury trials in that year and that "this is just another defendant" as far as he was concerned. <u>Id.</u> The judge then proceeded to preside over the defendant's trial. <u>Id.</u> at 36-37.

Discussing whether the trial judge's refusal to recuse himself was in error, the court stated that "[t]he petitioner must show that the refusal to recuse was a 'fundamental defect which inherently result[ed] in a complete miscarriage of justice . . . .'" <u>Id.</u> at 37 (quoting <u>Hill v. United States</u>, 368

the Court insofar as it recognizes that there is no *per se* rule requiring that the alleged impartiality arise from an extrajudicial source." <u>Id.</u> at 557.

8

U.S. 424, 428, 82 S. Ct. 468, 471, 7 L. Ed. 2d 417 (1962)). The court further reasoned that while a trial judge could be expected to react adversely to such unruly conduct, "[a] petitioner's deliberate attack on the trial judge calculated to disrupt the proceedings will not force a judge out of a case." Id. (citing Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91 S. Ct. 499, 504, 27 L. Ed. 2d 532 (1971)). To conclude otherwise would implicitly sanction such attacks in desperate attempts by defendants to precipitate new trials before new judges, encourage unruly courtroom behavior, and "greatly disrupt judicial administration." Id.

Thus, the Wilks court explicitly declined to adopt a per se rule based on the mere appearance of prejudice, opting instead to "examine the trial to ensure that the trial judge, despite good cause for adverse feelings toward a defendant, has conducted a fair trial." Id. at 37 n.6. The central criterion the Wilks court utilized in determining whether the trial judge had conducted a fair trial was whether the trial judge's rulings presented indicia of a bias against the defendant. Id. at 37. Finding, from a review of the record, that "the [trial] court's rulings were appropriate and in no way reflected any animosity toward the petitioner," the Wilks court concluded that "petitioner received a fair trial free from judicial prejudice." Id.

We agree with the Seventh Circuit's approach. A *per se* rule of recusal would lend itself to deliberate manipulation of the judicial system. Such an automatic rule would invite recusal motions from defendants whose sole purpose in attacking a judge or engaging in unruly behavior is either to manufacture constitutional due process violations or to delay trial proceedings. Therefore, contrary to petitioner's request, we decline to presume prejudice on the part of the trial judge simply because of the fact of the attack, but rather must examine the record for indications of actual bias on the part of the trial judge.

9

Petitioner urges that the trial judge's decision to allow evidence of petitioner's attack on the judge, and his concomitant refusal to provide a limiting instruction restricting the jury's consideration of the evidence to its bearing on petitioner's state of mind, constitute indicia of the trial court's bias. In determining whether the judge's ruling on these matters indicates bias on his part, we first look to the precise nature of the evidence proffered, and then to the court's stated basis, if any, for its decision to admit the evidence without a limiting instruction.

The state first proffered the testimony of Bailiff Tim M. Stallings ("Stallings"), who was present in the courtroom at the time of petitioner's escape attempt. Stallings testified in relevant part as follows:

Q.     During a break earlier this morning about 10:00 o'clock, where were you?

A.     I was sitting at my desk over there.

Q.     Who was in the courtroom as you recall at that time?

A.     The defendant, and I think you were.

Q.     When you say "the defendant," who are you talking about?

A.     James Bigby, the gentleman at the end of the table there. . . .

Q.     The jury was not in the courtroom, were they?

A.     No, sir. . . .

Q.     While you were seated . . . ., what did the defendant do?

A.     He got up like he was going to get a drink of water and then–

Q.     What happened at that point?

A.     And he didn't get any water and he started running behind the bench. I jumped up and started after him. . . .

Q.     What did he do?

10

A. He reached in and got to the Judge's desk and started reaching for the drawer, and I drew my weapon.

Q. Did you say anything at that point?

A. I told him to stop again.

Q. Did he?

A. No. He pointed a gun at me. . . .

Q. When you say "a gun," what kind of gun are you talking about?

A. .38 Colt.

Q. Revolver?

A. Yes, sir.

Q. What did he do with that gun?

A. He pointed it towards me.

Q. What happened at that point?

A. I ducked down behind the clerk's desk, and then I heard a noise, sounded like the Judge's chair was moving. So I jumped up and saw him running, and then I came around by the court reporter's desk and he pointed the gun at me again and I ducked, and by the time I could get back up, he had gone through the door into the corridor.

After the conclusion of Stallings' testimony, the state called Bailiff Barbara Hackney ("Hackney") to the stand. On direct examination, she testified as follows:

Q. How are you employed?

A. I'm employed by Judge Leonard as Grand Jury bailiff, Tarrant County.

Q. About 10:00 o'clock this morning were you in his office?

A. Yes, I was.

Q. Do you remember anybody else who was in the office?

11

A.      Yes. A man came through the door to the right side of me with a gun in his hand.

Q.      Do you see that person in the courtroom?

A.      Yes, I do. . . . This man over here with a suit on and hair back.

Mr. Medlin:      Your honor, may the reco rd reflect she has identified the Defendant?

THE COURT:      It may so reflect

Q.      Was Judge Leonard in the room?

A.      Yes, he was. . . .

Q.      What did the person you identified do as he walked into the Judge's room, office?

A.      He walked into the room beside the desk. . . . He had a gun in his hand. He walked up about two steps toward the Judge. . . and he pointed it at his head and said, "Let's go, Judge."

Q.      What happened at that point?

A.      At that point the Judge looked up at him and immediately jumped up out of his chair and grabbed the gun hand, slammed it up and back against the wall. They ended up against the wall, and when they did I ran out looking for someone to help.

Q.      Where did you see the person you identified point the gun at the Judge; at what part of the Judge did he point the gun?

A.      He pointed it right at his head. He was standing over – the Judge was sitting and he was standing over him, and he had it right at his head.

Q.      Are you talking about Judge Leonard seated just to your right?

A.      Yes, sir. Judge Leonard was seated right in front of me.

In evaluating the potential effect of this evidence on the jury, we are persuaded that while admitting Bailiff Stallings' testimony struck the appropriate balance between the competing concerns

12

regarding introducing evidence of Bigby's skullduggery, this delicate balance swung out of kilter when the prosecution proffered Bailiff Hackney's testimony. Hackney's testimony was prejudicial to the petitioner because of a jury's typically high regard for a presiding judge and the probability that the jury in Bigby's case came to identify with the judge during the course of the proceedings. See, e.g., Carolyn E. Demarest, Civility in the Courtroom from a Judge's Perspective, 69 N.Y. ST. B.J. 24, 25 (May/June 1997) ("[J]urors usually identify with the judge who, like themselves, is meant to be impartial. A personal attack upon the judge is likely to turn the jury against the attacking attorney . . . ."). Although admission of the evidence may have itself been a violation of petitioner's due process rights, because of the potential that its admission deprived defendant of a fair trial, that is a separate question from whether the trial judge's admission of the testimony- and corresponding failure to give a limiting instruction- constitute indicia of bias on the judge's part. Because the trial court provided a basis for admission of the evidence grounded in established law, we cannot conclude that such is the case.

After the state announced that it intended to proffer testimony of Bigby's attempted escape, defense counsel objected to the testimony on the basis that "the prejudicial nature of it highly outweighs the probative value," and that it would deny Bigby "a fair trial." The court overruled the objection, providing the following justification for its ruling:

> The Court finds that the evidence tendered by the state concerning his attempted escape is admissible on the basis of guilt or innocence in trials of this State, and it may have some relevance to the jury if they consider it important of any planning he might have affecting his insanity. I don't know if the jury thinks it's important or not, but they will receive it.

When presented with this issue on direct appeal, the Texas Court of Criminal Appeals analyzed the admissibility of the attack evidence solely from an evidentiary standpoint. It reasoned that

13

"[e]vidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn," and in Bigby's case "the evidence of flight enhance[d] the State's case." Bigby v. State, 892 S.W.2d 864, 883-84 (Tex. Crim. App. 1994). Thus, the Court of Criminal Appeals concluded that "the trial court's ruling was within the 'zone of reasonable disagreement'" and not clearly erroneous. Id. at 884.

In a subsequent application for state habeas corpus relief, Bigby asserted that Judge Leonard violated his due process rights by allowing evidence of his having assaulted the court. After deciding that a fact-finding hearing was unnecessary, the Criminal District Court characterized Bigby's claim as a mere evidentiary challenge that had been previously "raised and rejected by the Court of Criminal Appeals on direct appeal" and summarily concluded that Bigby "ha[d] failed to plead or prove that the issue rendered his conviction void . . . ."[3] Upon review, the Texas Court of Criminal Appeals found Bigby's due process argument similarly unavailing.[4]

By conflating Bigby's due process and evidentiary claims, the Texas state courts erred in their analysis of the bias issue. While the admissibility of the attack evidence and the ability of the trial judge to act as a fair and impartial tribunal are separate questions, they are necessarily interrelated.

---

[3]The court acknowledged that "[i]n his fourth and fifth grounds for relief, [Bigby] complains that his due process rights were violated when the State introduced testimony about the armed escape attempt made by [Bigby] during the defense's rebuttal case at the guilt-innocence phase of trial[,]" but ultimately concluded that "[a]lthough [Bigby] phrases his complaints as a denial of due process, his complaints are based solely on the admission of evidence at his trial."

[4]"With regard to his fourth allegation [Applicant's due process rights were violated by permitting the State to introduce testimony . . . concerning an incident of attempted escape which occurred out of the jury's presence during trial] the trial court found that [Bigby's] complaints were raised and rejected on direct appeal and that, although he phrases his complaints as a denial of due process, [Bigby's] allegations are really complaints concerning the admission of evidence at trial."

14

If the trial judge had no obvious support for his ruling in the law, the decision would likely reveal an illicit predisposition-the poisoned fount from which the ruling sprang.

While, in our opinion, the trial court erred in failing to quell the testimony regarding the attack before the jury heard Bailiff Hackney's rendition of the petitioner's taking the trial judge hostage and holding a gun to his head, we cannot conclude that this alone overrides the presumption of fairness on the trial judge's part and compels a conclusion that structural error inhered in petitioner's trial. The judge was not without a legal basis for his ruling, as under Texas law evidence of an escape is admissible if relevant. Burks v. State, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). Although the trial judge, as evidenced by his rulings, implicitly failed to recognize the prejudicial effect such evidence might have on the jury, he was not acting clearly outside the bounds of law or reason in a manner that would signal any bias toward the defendant. Thus, we conclude that the trial court's decisions in regard to the attack evidence do not, by themselves, constitute indicia of bias sufficient to declare the trial tainted by structural error.

This conclusion does not end our due process inquiry, however. We must next take up the question whether, apart from the issue of the trial judge's bias, the court's admission of the attack evidence and failure to provide a limiting instruction deprived petitioner of a fair trial, due to the prejudicial nature of the evidence. "[W]hen a state court admits evidence that is 'so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'" Dawson v. Delaware, 503 U.S. 159, 179 (1992) (quoting Payne v. Tennessee, 510 U.S. 808, 825 (1991)). In conducting this analysis, it is irrelevant whether the evidence was correctly admitted pursuant to state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, our sole inquiry is whether the admission violated the Constitution. Id. at 68.

15

Whether admission of the attack evidence, coupled with the trial court's refusal to provide a limiting instruction, constitute a violation of defendant's due process rights is not the sole focus of our constitutional analysis. "Assuming *arguendo* that the admission of [the evidence] was constitutional error," petitioner's claim will still fail absent a showing "that the testimony had a 'substantial and injurious effect or influence in determining the jury's [] verdict.'" Janecka v. Cockrell, 301 F.3d 316, 328-29 (5th Cir. 2002). Examining the evidence put forth during the guilt/innocence stage of Bigby's trial, we find "it is highly improbable that the jury would have" reached a different verdict had the evidence been excluded, or had the trial judge given a limiting instruction. See id. The state presented overwhelming evidence that defendant committed the murders, including two confessions by defendant. It also elicited testimony from two psychiatric experts, including one who had been petitioner's psychiatrist before his incarceration, that Bigby did not suffer from a severe mental disease or defect such that he could not tell or did not know his conduct was wrong. As the Court of Criminal Appeals concluded, "[w]hile several of appellant's experts testified that appellant could not or did not know his conduct was wrong, several did testify that appellant knew his conduct was illegal." Bigby, 892 S.W.2d at 877. Furthermore, Bigby's statement to the police at the time of his arrest, that "'I know I am guilty and so do you'. . . evinces an understanding by [Bigby] that he knew his conduct was illegal." Id. We therefore conclude that, even if the prejudicial effect of the attack evidence was of a constitutional dimension, petitioner's due process argument fails because he cannot establish that the evidence had a substantial or injurious effect or influence on the jury's verdict at the guilt/innocence stage of the proceedings.

The effect of the attack evidence at the sentencing stage is more difficult. We decline to consider this question, however, because, as discussed below, we vacate petitioner's sentence and

16

remand this case for resentencing on the basis that the trial court committed reversible error in giving the "nullification instruction" to the jury during the sentencing proceedings.

IV.    Bigby's Additional Claims for Grant of COA

A.    Unconstitutional Jury Instructions

In his application for COA, Bigby further argues that the district court's jury instruction gave the jurors an option of nullifying mitigating circumstances and thus impinged his right to have an individualized assessment of the appropriateness of the death penalty in his case. According to Bigby, this violated Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 256 (1989) (Penry I). The Texas Court of Criminal Appeals rejected this complaint when Bigby raised it on direct appeal. Bigby, 892 S.W.2d at 890. Relying on Roberts v. Louisiana, 428 U.S. 325, 335, 96 S. Ct. 3001, 3007, 49 L. Ed. 2d 974 (1976), Bigby reiterates his nullification argument by claiming that there is an "element of capriciousness in making the jurors' power to avoid the death penalty dependant on their willingness to accept [an] invitation" to render a false verdict.

A State's capital punishment scheme must do two things to meet the requirements of the Eighth Amendment. First, it must "channel the discretion of judges and juries to ensure that death sentences are not meted out wantonly or freakishly." Graham v. Collins, 506 U.S. 461, 468, 113 S. Ct. 892, 898, 122 L. Ed. 2d 260 (1993). Second, it must confer sufficient discretion on the sentencing body to consider the character and record of the individual offender. Id. Thus, the relevant mitigating evidence cannot be placed beyond the effective reach of the jury. Id. at 475. "To grant relief on a Penry claim, we must determine (1) whether the mitigating evidence has met the "low threshold for relevance" Tennard v. Dretke, 124 S.Ct. 2562, 2570 (2004), and, if so, (2) that the

17

evidence was beyond the effective scope of the jury. Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994).

We conclude that Bigby has demonstrated that reasonable jurists would find the district court's assessment of his Penry claim debatable. See Miller-El, 123 S. Ct. at 1040. First, Bigby has established the existence of relevant mitigating evidence.[5] In particular, Bigby has provided testimony that he suffers from chronic paranoid schizophrenia that he argues contributed to his criminal action. Second, the nullification instruction at issue in the instant case is similar to the nullification instruction that the Supreme Court rejected as unconstitutional in Penry I, rendering the mitigating evidence out of the reach of the jurors during the punishment phase of Bigby's trial. Thus, we reverse the district court's denial of a COA on this issue and grant the COA. During the pendency of this appeal the Supreme Court handed down Penry II, 532 U.S. 782, 121 S. Ct. 1910 (2001) and the en banc court decided Robertson v. Cockrell, 325 F.3d 243 (5th Cir. 2003). In addition, since the issuance of the original opinion in this case, the Supreme Court also announced decisions in Tennard v. Dretke, 124 S. Ct. 2562, 159 L. Ed.2d 384 (2004), and Smith v. Texas, 125 S. Ct. 400, 160 L. Ed.2d 303 (2004), which are relevant to the issues in this appeal. Because the post oral argument briefing has to a large

---

[5] Throughout this appeal the State of Texas has contended that because this circuit's law requires "constitutionally relevant mitigating evidence" as established under a long line of cases, and more recently applied in Robertson v. Cockrell, 325 F.3d 243 (5th Cir. 2003), Bigby fell short of showing his entitlement to the relief he seeks here. The viability of the "constitutionally relevant mitigating evidence" standard in the context of a mitigating evidence claim was directly at issue in the Supreme Court's recent decision in Tennard v. Dretke, 124 S.Ct. 2562 (2004). In rejecting the State's claim that the Fifth Circuit's Penry I jurisprudence was not at issue in Tennard, the Court stated "As we have explained, the Fifth Circuit's screening test has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context . . . [and,] [w]e therefore hold that the Fifth Circuit assessed Tennard's Penry claim under an improper legal standard." Id. at 2572. Justice O'Connor expressly noted: "We hold that the Fifth Circuit's 'uniquely severe permanent handicap' and 'nexus' tests are incorrect, and we reject them." Id. at 2573.

extent addressed these cases and because the evidentiary record is complete, we conclude that the merits of the COA Penry claim - that the nullification instruction during the sentencing phase of his trial was constitutionally defective - is ripe for decision.

1) Relevant Mitigating Evidence

The Supreme Court recently held that "a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death . . . .[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." Payne, 501 U.S. at 822 (quoting Eddings v. Oklahoma, 455 U.S. 104, 114 (1982)) (quoted in Tennard, 124 S.Ct. at 2570). The Court defined relevant mitigating evidence as "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard, 124 S.Ct. at 2570 (quoting McKoy v. North Carolina, 494 U.S. 433, 440 (1990) (relevant mitigating evidence defined in the most expansive terms)). Furthermore, the Court added that "a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find it warrants a sentence less than death.'" Id. (quoting McKoy, 494 U.S. at 440). In view of the Supreme Court's clarification of the relevant evidence standard applicable in death penalty cases, we now consider the evidence of record in this case.

During Bigby's trial, Dr. James Grigson ("Dr. Grigson"), psychiatrist, was called to testify on Bigby's behalf. Dr. Grigson stated that in his opinion, Bigby suffers from chronic paranoid schizophrenia. He testified that paranoid schizophrenia is one of the more serious and severe forms of mental illnesses. When asked to explain to the jury the effects of this disease, Dr. Grigson stated that usually individuals suffering from this mental condition "feel[] that people are plotting against

19

them or doing things to hurt them." He continued to clarify that schizophrenia means "that the individual is suffering from a psychosis where there is gross impairment in terms of interpersonal relationships . . . and reality testing, meaning that they misperceive what is going on around them." As a result, Dr. Grigson stated that this paranoid disorder manifests itself in psychotic delusional beliefs.

Bigby's trial counsel asked Dr. Grigson if Bigby had suffered from any delusions or psychotic beliefs. The physician responded in the affirmative. Specifically, he stated that at the time the murders occurred, Bigby suffered from delusions that Michael Trekell was involved in a conspiracy against him. In his opinion, Dr. Grigson testified that "at the time of the offense . . . Bigby was suffering from [this] serious severe mental illness and was not aware of the difference between right and wrong." Dr. Grigson concluded that there is no other explanation for Bigby's actions other than the fact that he suffers from a mental illness.[6] At

---

[6]The actual testimony given by Dr. Grigson is as follows:

Q. As a result of [the psychiatric] examinations, were you able to form an opinion as to whether or not Mr. Bigby suffered from mental illness or mental defect.

A. Yes, sir, I was.

Q. And what is that?

A. Yes, in my opinion he is suffering from a mental illness, that being chronic paranoid schizophrenia.

\*\*\*

Q. During the examinations that you did of Mr. Bigby, did you discuss with him the basis of the charges against him here, the killings of the infant, Jayson [Trekell], and his father, Mike Trekell?

A. Yes, sir, I did.

Q. And as a result of your conversations regarding these murders with Mr. Bigby, were you able to form an opinion as regards to his sanity at the time of the offense.

A. Yes, sir, I was.

Q. And what is that opinion, Doctor?

A. It is my opinion at the time of the offense Mr. Bigby was suffering from a severe mental illness and was not aware of the difference between right and wrong. He could not appreciate it.

***

Q. Is it your opinion that . . . in connection with this schizophrenic illness that he suffers from, does Mr. Bigby have any type of delusions or delusional system that he suffers from.

A. Oh, yes, sir, he certainly does.

Q. What is the nature of that?

A. Well, this goes back to the injury that he had while working for Frito Lay. He was awarded - in his mind - $26,000, which Frito Lay refused to pay. He felt that they were sending people out to follow him, look at him. He felt that they were plotting against him. And this slowly spread to include other people, his friends, that they, too, were plotting against him.

Q. Essentially, the individual Mike Trekell, the person that he killed in connection with this case, was that a person that he felt like was involved in the conspiracy?

A. Oh, yes, sir, it certainly was. He felt that he was a part of the conspiracy.

Q. Did that belief have anything to do with the actual murder itself?

A. Absolutely, without the delusional state, without his schizophrenia, he would not have killed that person. There was no reason for it.

Q. What about the infant; did Mr. Bigby ever express any reason to you or any explanation as to why he killed the baby, Jason [Trekell]?

A. No. He was - - the baby was there. Actually he had been fond of the baby prior to that time and this was part of an irrational act that occurred. It was very tragic, but still an irrational act on his part.

21

the sentencing phase, Dr. Grigson reiterated his belief that Bigby suffers from chronic paranoid schizophrenia. Further, evidence was adduced that Bigby's condition could not be adequately controlled with medication.

Applying the low threshold as articulated in Tennard, it is clear that the evidence submitted by Bigby constitutes relevant mitigating evidence. Paranoid Schizophrenia is a severe mental illness. Bigby has adduced evidence to show that he was suffering from this illness at the time of the murders. It is not required that he show that his condition be somehow linked to his conduct, only that it existed, and that it could lead a jury to find that a sentence other than death is warranted. See Tennard, 124 S.Ct. at 2570; Skipper v. South Carolina, 476 U.S. 1, 5 (1986) (evidence of defendant's good conduct in jail, while not related specifically to his culpability for the crime he committed, must nonetheless be allowed before the jury because "such evidence would be mitigating in the sense that it might serve as a basis for a sentence less than death."). Thus, we find that Bigby's paranoid schizophrenia is relevant mitigating evidence that he must be allowed to present to the jury.

### 2) Jury Instructions

We now turn to Bigby's contention concerning the constitutionality of the jury instructions given by the trial judge at the sentencing phase. Bigby argues that the jury instructions impermissibly restricted the jury's consideration of mitigating circumstances in violation of the Supreme Court's

Q. Essentially there is no other explanation for it other than his illness.

A. Right, that's true.

(Emphasis added.)

22

decisions in Penry I and Penry II. In Penry I, the Court held that Penry's Eighth Amendment rights were violated because the jury was inadequately charged with respect to mitigating evidence at Penry's sentencing hearing. At the conclusion of the hearing, the jury was instructed to answer three "special issues": (1) whether the conduct that caused the death of the victim was committed deliberately and with a reasonable expectation that death would result; (2) whether there was a probability that the defendant would commit acts that would constitute a continuing threat to society; and (3) whether the conduct was an unreasonable response to any provocation by the victim. The Supreme Court held that none of these special issues were broad enough to allow the jury to consider and give effect to the mitigating evidence offered by Penry that he was mentally retarded and had been severely abused as a child.

The Supreme Court emphasized that its ruling was not a "new rule" under Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). The Court held that "at the time Penry's conviction became final, it was clear from [Lockett v. Ohio, 438 U.S. 586 (1978)] and [Eddings v. Oklahoma, 455 U.S. 104 (1982)] that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." Penry I, 492 U.S. at 318. However, the Court reaffirmed its holding in Jurek v. Texas, 428 U.S. 262 (1976), which upheld the constitutionality of the Texas death penalty sentencing scheme against an Eighth Amendment challenge. Id. at 315. Jurek dismissed a facial challenge to the Texas death penalty statute but reasoned that the statute's constitutionality "turns on whether the enumerated questions allow consideration of particularized mitigating factors." 428 U.S. at 272. Penry I held that in certain cases, Texas' statutory special issues, as applied, did not give

the jury sufficient opportunity to consider and give effect to the mitigation evidence without appropriate additional instructions. Penry I, 492 U.S. at 318. Additional instructions informing the jury that it could consider and give effect to the defendant's mitigation evidence are required where the evidence was not relevant to the special issue questions or had relevance to the defendant's moral culpability beyond the scope of the special issues questions, and the jury was otherwise unable to express its reasoned moral response to that evidence in rendering its sentencing decision. Id. at 322-29.

On remand, Penry was again found guilty, and the state court instructed the jury to answer the same three special issues given at his first trial. The jury was also admonished that a "yes" answer to any of the special issues was warranted only if supported by the evidence "beyond a reasonable doubt," while a "no" answer is appropriate only if there is a reasonable doubt that the answer to the special issues should be "yes." In addition, the court also provided a "supplemental instruction" indicating that when the jury deliberated on the special issues, it was to consider mitigating issues, if any, presented by the evidence. The instruction provided as follows:

> If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability *at the time you answer the special issue.* If you determine, when giving effect to the mitigation evidence, if any, that a life sentence, *as reflected by a negative finding to the issue under consideration*, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues*. Penry II, 532 U.S. at 797-798.

The verdict form contained only the text of the three special issues, however, and gave the jury the choice of only answering "yes" or "no." The jury again answered all of the special issues "yes" and Penry was given the death penalty.

24

In Penry II, the Supreme Court ruled that this supplemental instruction provided "an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." 532 U.S. at 790. The Court stated that because Penry's mitigating evidence did not fit within the scope of the special issues, answering the special issue questions in the manner prescribed on the verdict form was both logically and ethically impossible. Id. at 799. Specifically, the Court noted that instructing the jury to answer the special issues "yes" only if supported by the evidence "beyond a reasonable doubt," while at the same time instructing the jury that it could ignore these guidelines and answer one or more of the special issues "no" in order to give effect to any mitigating evidence presented by Penry, made the jury charge as a whole internally contradictory and placed jurors in an impossible situation. In effect, the instruction allowed the jurors to change one or more "truthful 'yes' answers to an untruthful 'no' answer in order to avoid the death sentence for Penry." Id. Thus, if the jury desired to answer one or more of the special issues untruthfully to give credence to the mitigating evidence presented by Penry, they would have had to violate their oath to render a "true verdict." Id. at 800 (internal quotation marks and citation omitted). The supplemental instruction thus inserted an element of capriciousness into the sentencing decision, making the jurors' power to avoid the death penalty dependent on their willingness to elevate the supplemental instruction over the verdict form instructions. Id.

After concluding that the supplemental instruction given Penry's jury was inadequate, Justice O'Connor further explained that a "clearly drafted catchall instruction on mitigating evidence . . . might have complied with Penry I." Id. at 803. The Court used as a model the supplemental instruction drafted by the Texas legislature after Penry I, and after Penry's remand trial. The Court noted that this supplemental instruction, currently required by the Texas Criminal Procedure Code

25

to be given in capital cases, provided a "helpful frame of reference." Id. This instruction reads as follows:

> The court shall instruct the jury that if the jury returns an affirmative finding to each [of the first two special issues], it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. TEX. CRIM. PROC. CODE ANN. § 37.071(2)(e)(1) (Vernon Supp. 2004).

The Court observed that Penry's defense counsel conceded that he would have a difficult time arguing that this instruction did not comply with Penry I. The Court then concluded that "[a]t the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available . . . ." Id. at 803.

Recently, in Smith v. Texas, 125 S. Ct. 400 (2004), the Supreme Court again confronted substantially similar jury instructions as those present in Penry II, and the Court *again* held that the jury instructions were unconstitutional. Although the supplemental instruction in Smith was not identical to the one given in Penry II, the Smith Court stated that the distinctions were constitutionally insignificant. Smith, 125 S. Ct. at 406. The instruction in Smith read in relevant part as follows:

> You are instructed that you shall consider any evidence which, in your opinion, is mitigating. . . . You may hear evidence which, in your judgment, has no relationship to any of the Special Issues, but if you find such evidence is mitigating under these instructions, you shall consider it in the following instructions of the Court. You, and each of you, are the sole judges of what evidence, if any, is mitigating and how much weight, if any, the mitigating circumstances, if any, including those which have no relationship to any of the Special Issues, deserves. In answering the Special Issues submitted to you herein, if you believe that the State has proved beyond a reasonable doubt that the answers to the Special Issues are "Yes," and you also believe from the mitigating evidence, if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence

26

presented to you. In this regard, your are further instructed that the State of Texas must prove beyond reasonable doubt that the death sentence should be imposed despite the mitigating evidence, if any, admitted before you. Smith, 125 S.Ct. at 402-03.

As in Penry II, the Court found that the jury was faced with the ethical dilemma of either answering the special issue questions in a manner prescribed on the verdict form and ignoring the supplemental instruction, or answering the questions as prescribed by the supplemental instruction which necessarily meant ignoring the verdict form instructions. Id. As in Penry II, the problem presented itself because Smith's mitigation evidence of organic learning disabilities and speech handicaps at an early age, a low IQ, and a drug addicted criminal father apparently did not fit within the scope of the special issues. Id. at 407 ("And just as in Penry II, the burden of proof on the State was tied by law to findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented.")

The Supreme Court's rulings in Penry II and Smith should not be read to disturb its earlier holdings affirming the constitutionality of Texas' statutory death penalty sentencing scheme. See Jurek, 428 U.S. 262; see also Franklin v. Lynaugh, 487 U.S. 164 (1988); Graham v. Collins, 506 U.S. 461 (1993); Johnson v. Texas, 509 U.S. 350 (1993); In re Kunkle, 2005 WL 151917 (5th Cir. Jan. 20, 2005). The Court has found a supplemental instruction, like the one present in Bigby's trial, to be unconstitutional only where the special issue questions themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence. Robertson v. Cockrell, 325 F.3d 243, 258 (5th Cir. 2003) (finding that where the Texas special issues allow the jury to give mitigating effect to the proffered evidence, the presence of the supplemental instruction cannot constitute error). When the jury is able to consider and give effect to the mitigation evidence in

27

imposing sentence, the special issue questions are constitutionally adequate. Penry II, 532 U.S. at 797 (quoting Johnson, 509 U.S. at 381 (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances")). Thus, in considering a Penry II claim, the court must ask whether the evidence is beyond the effective reach of the jury.

We are aware of the precedent in this Circuit that evidence that a petitioner was suffering from schizophrenia at the time of the crime may be considered under the first interrogatory; or alternatively, that mitigation evidence of schizophrenia may be considered under the future dangerousness special issue, if the schizophrenia can be controlled or goes into remission. However, we find those cases to be distinguishable. In Lucas v. Johnson, 132 F.3d 1069 (5th Cir. 1998), the petitioner essentially tried to put forth an insanity defense during sentencing after initially asserting his innocence at trial. 132 F.3d at 1082 ("One expert further explained that if Lucas had committed the Orange Socks murder, then at the time of the act '[h]e would have been psychotic, meaning out of touch with reality, out of control over his impulses, over his drives ... insane.'"). The Lucas court held that a sentencer could give effect to that testimony under the first interrogatory since it went to whether he acted deliberately when he committed the murder. Although Bigby's history of mental illness was relevant to whether he acted deliberately, it also spoke to his moral culpability. Importantly, Bigby's evidence indicated that his schizophrenia was chronic and severe, caused him to suffer delusions with respect to the actions and motivations of the people around him, could not be adequately treated, and significantly impacted his interpersonal relationship abilities. Inquiry into whether Bigby acted deliberately fails to fully account for the potential impact such a debilitating condition may have upon the jury's perception of Bigby's moral responsibility for his crimes. Thus,

28

as in <u>Penry I</u>, the first interrogatory did not adequately allow the jury to consider the effect of this evidence upon Bigby's personal culpability.[7] <u>Id.</u> at 322-23.

Furthermore, although this Circuit has previously held that mitigation evidence of mental illness could be considered within the context of the second special issue, future dangerousness, if the illness can be controlled or go into remission, <u>see e.g.</u>, <u>Lucas</u>, 132 F.3d 1069; <u>see also</u> <u>Hernandez v. Johnson</u>, 248 F.3d 344 (5th Cir. 2001), Bigby's mitigation evidence indicated that his condition cannot be adequately controlled or treated.  Bigby averred that his mental condition prevented him from being able to conform his behavior.  Even after being in the controlled environment of jail for some time, Bigby irrationally tried to take the trial court judge hostage in the presence of armed bailiffs.  His behavior also required him having to be restrained during trial.  The defense psychiatrist testified that the outburst was not unexpected because medication was not sufficient to control his behavior and thinking.  In short, Bigby's evidence that his mental disorders made it difficult for him to avoid criminal behavior  has the same "double-edged sword" quality as Penry's evidence that he was unable to conform his conduct to the law.

The special issues and supplemental instruction given at the conclusion of Bigby's sentencing hearing are almost identical to those discussed  in <u>Penry II</u> and <u>Smith</u>.[8]

---

[7] While the state's argument–that any defect described in <u>Penry</u> with regard to the first interrogatory was cured because "deliberately" was defined–is persuasive, we find that the definition given by the state trial court was not sufficient to cure the infirmities found by the Supreme Court. <u>See</u> <u>Penry I</u>, 492 U.S. at 322-23; <u>see also</u> <u>Penry II</u>, 782 U.S. at 803; <u>Davis v.  Scott</u>, 51 F.3d 457 (5th Cir. 1995).

[8] The special issues provided the juries in <u>Penry II</u> and <u>Smith</u> corresponded almost exactly with the special issues given at Bigby's sentencing:

**SPECIAL ISSUE NO. 1**
Do you find from the evidence beyond a reasonable doubt the conduct of the Defendant . . .

In the present case, Bigby's jury was given the following supplemental instruction:

> If you find that there are an mitigating circumstances, you must decide how much weight they deserve and give them that effect you believe to be appropriate when you answer the Special Issues. If you decide, in consideration of the evidence, if any, that a life sentence, rather than a death sentence, is a more appropriate response to the personal moral culpability of the defendant, or if you have a reasonable doubt thereof, you are instructed then to answer any special issues, to which such mitigating circumstances apply, and under consideration "no."

Like the supplemental instructions in both Penry II and Smith, this instruction ties the jury's consideration of Bigby's mitigating evidence to the special issues. Specifically, it instructs the jury that if they find the mitigating evidence sufficient to warrant a life sentence rather than the death penalty, they must answer any special issues "*to which such mitigating circumstances apply*" in the negative. Thus, the instruction effectively shackled and confined the jury within the scope of the special issues. As we have found, these issues failed to allow the jury to give effect to Bigby's mitigating evidence. Further, even if the jury understood the instruction as directing them to "nullify" their answers to the special issues, they still would have faced the ethical dilemma of violating their oath to render a "true verdict" by providing false answers to the special issues in order to give effect

---

was committed deliberately and with reasonable expectations that . . . death . . . would result?

**SPECIAL ISSUE NO. 2**
Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant . . . would commit criminal acts of violence that would constitute a continuing threat to society?

**SPECIAL ISSUE NO. 3**

Do you find from the evidence beyond a reasonable doubt that the conduct of the Defendant. . . was unreasonable in response to the provocation, if any [by the victim(s)]?

See TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1981) (amended 1991).

to Bigby's mitigating evidence and comply with the supplemental instruction. Finally, the instruction given Bigby's jury lacks the "brevity and clarity" of the instruction provided in the Texas Criminal Procedure Code.

Because we discern no meaningful distinction between the charges given in Penry II and Smith, and those given in the instant case, we find that Bigby has demonstrated that the contested jury instructions stripped the jury of a vehicle for expressing its "reasoned moral response"[9] to the appropriateness of the death penalty. In short, the same constitutional infirmities criticized by the Supreme Court in Penry II and Smith are present in Bigby. Accordingly, since the decision of the Texas Court of Criminal Appeals is contrary to clearly established federal law, we reverse the district court's denial of Bigby's application for COA with regard to his jury instruction claim, vacate his sentence, and remand this case to the district court for entry of an order granting Bigby habeas relief on his Penry claim and setting aside his sentence.

B.     Denial of the Right to Impeach Witnesses

Bigby contends that the trial court improperly denied him the right to impeach Grace Kehler, the chief witness against him, by showing that her pending civil suit provided a motive to testify falsely and by pointing out that Kehler had made contradictory allegations in the civil suit. A review of the record, however, reveals a different account of the trial proceedings. In particular, Judge Leonard did allow Bigby to question Kehler about any potential pecuniary interests arising from her unresolved wrongful death suit against Bigby's physician and treating hospitals for failing to attend adequately his mental illness. The judge merely informed Bigby's counsel that he would not allow the civil petitions into evidence unless Kehler denied the suit.

---

[9]Penry I, 492 U.S. at 319.

31

Bigby correctly notes that the Sixth Amendment guarantee of a criminal defendant's right to confront witnesses against him includes the right to cross-examination. See Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974). But this right is subject to the wide latitude of trial judges to impose reasonable limits. See id. (stating that the right to cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation"); Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986). As such, the Confrontation Clause does not guarantee defendants cross-examination to whatever extent they desire. Van Arsdall, 475 U.S. at 678. Bigby fails to demonstrate that his efforts to impeach Kehler were unconstitutionally circumscribed or that the State's rejection of his impeachment complaints constitute an unreasonable application of clearly established federal law. Accordingly, no reason exists to issue a COA on this issue.

C.     Shackled and Handcuffed in the Jury's Presence

Bigby next contends that the trial court erred by shackling him during the trial and allowing the jury to see him handcuffed. "While a defendant is entitled to the physical indicia of innocence, a court is justified in ordering him handcuffed and shackled during trial [when] there is danger of escape or injury to the jury, counsel, or other trial participants." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994); see also Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 1346, 89 L. Ed. 2d 525 (1986)(stating that shackling is permissible only when "justified by an essential state interest specific to each trial"); Illinois v. Allen, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 1061, 25 L. Ed. 2d 353 (1970)(opining that trial judges "must be given sufficient discretion" to ensure the "dignity, order, and decorum . . . of all court proceedings" and concluding that binding and gagging an obstreperous defendant is constitutionally acceptable in some situations). After Bigby

32

assaulted Judge Leonard, it was incontrovertible that he posed a real danger to all assembled in the trial court. Judge Leonard, therefore, was not beyond the bounds of his ample discretion to decide whether a defendant should be restrained when he ordered Bigby shackled and handcuffed. See Lockhart v. Johnson, 104 F.3d 54, 57 (5th Cir. 1997)("The decision to restrain an obstreperous defendant with visible restraints lies within the sound discretion of the trial judge." (citing Allen, 397 U.S. at 343-44)). Accordingly, a COA should not issue on this point.

D.     Juror Challenges

Bigby next attempts to secure a COA by arguing that he was denied due process when the trial court altered the sequence established in Article 35.13 of the Texas Code of Criminal Procedure for challenging jurors in a capital case. "Article 35.13 states . . . that the veniremen shall 'be passed for acceptance or challenge first to the state and then to the defendant.'" Bigby, 892 S.W.2d at 879. Upon both parties' completion of voir dire, the state must choose to accept the venire member or challenge him either for cause or peremptorily: only then should the defendant or his counsel exercise its peremptory or causal challenge. Id. at 880.

In Bigby's case, the trial court ruled that the voir dire challenges of venire member 12 would proceed as follows: "State's challenge for cause, appellant's challenge for cause, State's peremptory challenge, and appellant's peremptory challenge." Id. at 879. Arguing that this ruling violated the selection procedure set forth in Article 35.13, Bigby's counsel objected. Id. Although the Texas Court of Criminal Appeals concluded that the district court erred in overruling this objection to the order of voir dire, it ultimately held the error to be harmless. Id. at 881-82.

In addressing Bigby's claims for a grant of COA based on the irregularity in the sequence of challenges during voir dire, we note that violations of state law are not generally cognizable on habeas

review unless the error renders the trial as a whole fundamentally unfair. See Fuller v. Johnson, 158 F.3d 903, 908 (5th Cir. 1998) (citing Engle v. Isaac, 456 U.S. 107, 135, 102 S. Ct. 1558, 1575, 71 L. Ed. 2d 783 (1982)). Bigby fails to demonstrate that the tactical disadvantage, which he allegedly suffered as a result of the trial court's deviation, resulted in a fundamentally unfair trial. Therefore, his claim is insufficient to support the issuance of a COA.

E.      Ineffective Assistance of Counsel

After evidence of Bigby's assault on Judge Leonard was admitted, defense counsel sought to withdraw from the case, arguing that they should be allowed to appear as witnesses regarding the incident and its relation to Bigby's mental instability. Judge Leonard denied the request based on the unnecessary delay it would create, but suggested that only one of Bigby's defense attorneys testify. Although such a course of action may have constituted a conflict of interest, neither of Bigby's attorneys decided to take the stand. Bigby nonetheless asserts that those decisions somehow denied him effective assistance of counsel.

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), guides our review of Bigby's ineffective assistance of counsel claim. Bigby's burden is twofold. First, he must demonstrate that his counsel's performance was deficient. See Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Second, Bigby must demonstrate that the deficient performance prejudiced him. See id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. Bigby asserts no clear grounds for deficient performance and cannot show prejudice from a conflict of interest because his attorneys did not testify. Accordingly, a COA should not issue on this point.

34

F.        Material Exculpatory Evidence Withheld

Finally, Bigby contends that the prosecution abridged his due process right by failing to provide medical records from the county jail that detailed the numerous psychotropic medications he was taking while incarcerated and awaiting trial. Due process is violated when the prosecution withholds material evidence favorable to the defense. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). The state, however, bears no responsibility to direct the defense toward potentially exculpatory evidence that either is in the possession of the defense or can be discovered through the exercise of reasonable diligence. Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997). Because the records to which Bigby refers were available through the exercise of such reasonable diligence, a COA should not issue on this claim.

CONCLUSION

For the foregoing reasons, we AFFIRM Bigby's conviction. We REVERSE the district court's denial of Bigby's application for COA with regard to his nullification instruction claim, GRANT the COA, VACATE Bigby's sentence, and REMAND this case to the district court of entry of an order granting Bigby's habeas relief on his Penry claim and setting aside his sentence.

AFFIRM in part, REVERSE in part, VACATE AND REMAND.