**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 1, 2006**

**Charles R. Fulbruge III**
Clerk

REVISED MARCH 7, 2006

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-11096
_____

BILLY RAY NELSON,

Petitioner-Appellant,

versus

DOUGLAS DRETKE, Director, Texas Department
of Criminal Justice, Correctional Institutions Division,

Respondent-Appellee.

_____

On Appeal from the United States District Court
For the Northern District of Texas

_____

ON REMAND FROM THE UNITED STATES SUPREME COURT

Before JONES, Chief Judge, and STEWART and DENNIS, Circuit Judges.

EDITH H. JONES, Chief Judge:

This death penalty case is reconsidered pursuant to the Supreme Court's instruction following its summary grant of certiorari and the vacating of our prior opinion based on <u>Tennard v. Dretke</u>, 542 U.S. 274, 124 S. Ct. 2562 (2004). The panel affirms, but we are divided on our reasoning.[1]

In his appeal to this court, Nelson sought a COA on three issues: (1) whether the Texas penalty phase instructions used at

---

[1] Judge Stewart concurs in the judgment. Judge Dennis specially concurs <u>infra</u>.

trial provided the jury with an adequate vehicle to consider his mitigating evidence, as required by the Eighth and Fourteenth Amendments as construed in Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989); (2) ineffectiveness of counsel for failing to request an instruction on the definition of reasonable doubt at the penalty phase; and (3) improper testimony by a state psychiatrist in light of Estelle v. Smith, 451 U.S. 454, 101 S. Ct. 1866 (1981). We granted a COA on the first two issues but denied COA on the third issue and ultimately affirmed the district court's denial of habeas relief.

Nelson then appealed to the Supreme Court. Following that Court's decision in Tennard v. Dretke, 542 U.S. 274, 124 S. Ct. 2562 (2004), and remand to this court, we requested further briefing based on Tennard.

After again reviewing the complete record, we reaffirm the grant of COA and affirm the district court's denial of habeas relief as to Nelson's Penry claim.[2]

## BACKGROUND

Nelson was indicted for the capital murder of Charla M. Wheat and the attempted capital murder of Wheat's roommate Carol Maynard that occurred on or about February 23, 1991. In December 1991, Nelson was tried for the capital murder of Wheat. During the guilt/innocence phase of trial Maynard testified as to the events

---

[2] We reinstate our denial of relief and of COA on the issues not relevant to Tennard.

of February 23. Specifically, Maynard testified that she and Wheat were forced, at knifepoint, by Nelson to perform sexual acts on each other and on Nelson. Maynard further testified that Nelson stabbed Wheat. Nelson also stabbed Maynard, who was five months pregnant at the time, but she pretended to be dead and thus survived. Other testimony established that the stab wounds were the cause of Wheat's death. Also, at trial, two voluntary confessions by Nelson admitted that he committed the crime because he "was drunk and wanted a piece of butt."

On December 11, 1991, the jury found Nelson guilty of capital murder. On December 13, following the punishment phase of trial, the jury answered affirmatively the two special issues submitted pursuant to Texas Code of Criminal Procedure article 37.071(b).[3] Nelson was sentenced to death. Nelson's sentence and conviction were affirmed on direct appeal by the Texas Court of Criminal Appeals on May 26, 1993. The United States Supreme Court denied Nelson's petition for writ of certiorari on March 21, 1994.

On April 17, 1997, Nelson commenced a series of state

---

[3] The special issues are:
(b) On conclusion of the presentation of the evidence, the court shall submit the following . . . [special] issues to the jury:
(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]
TEX. CODE CRIM. PROC. ANN. ART. 37.071(b)(1) and (2). This statute was amended in 1991. All references to the "special issues" in this opinion reflect the statute as it was written at the time of Nelson's trial.

applications for writ of habeas corpus. The state district court issued findings of fact and conclusions of law recommending denial of relief on all of Nelson's claims on July 10, 2001. The Texas Court of Criminal Appeals denied Nelson's application on the findings and recommendations of the trial court. Additionally, it dismissed Nelson's subsequent application as an abuse of the writ under TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 11.071, § 5(a).

## DISCUSSION

As we did in Nelson's prior appeal, we grant a COA on the question whether the special issue instructions given to the jury at sentencing failed to provide an adequate vehicle to give effect to his mitigating evidence in violation of Penry v. Lynaugh (Penry I), 492 U.S. 302, 109 S. Ct. 2934 (1989), and in light of Tennard and Smith. The instructions given by the trial court were, in pertinent part, the standard Texas capital case instructions, i.e., those given in Penry I.

We grant a COA, but we conclude that, although the district court partially relied on this court's now-defunct "constitutional relevance" analysis of mitigating evidence, the district court properly denied relief on Nelson's Penry claim. See, e.g., McGruder v. Will, 204 F.3d 220, 222 (5th Cir. 2000) ("We need not accept the district court's rationale and may affirm on any grounds supported by the record."). We cannot grant relief on a constitutional claim raised in a petition for habeas corpus

4

unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Although we review the federal district court's treatment of Nelson's habeas petition, the real focus of inquiry is the decision of the Texas courts, none of which used this court's now-overruled test.

This court recently noted that, "The Supreme Court's rulings in Penry II and Smith should not be read to disturb its earlier holdings affirming the constitutionality of Texas's statutory death penalty sentencing scheme." Bigby v. Dretke, 402 F.3d 551, 570 (5th Cir. 2005) (internal citations omitted). Accordingly, for a Penry I claim to succeed, a court must first determine whether the defendant's proffered mitigating evidence reasonably might serve as a basis for a sentence less than death. Tennard, 124 S. Ct. at 2571. In this inquiry, mitigating evidence is "relevant" so long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. (quoting McKoy v. North Carolina, 494 U.S. 433, 440, 110 S. Ct. 1227, 1232 (1990) and New Jersey v. T.L.O., 469 U.S. 325, 345, 105 S. Ct. 733, 744 (1985)). Second, we must determine whether the proffered, relevant evidence was beyond the "effective reach" of the jurors. Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994). Evidence is beyond the "effective reach" of

5

the jury "only if there exists a reasonable likelihood that the jury would have [found] itself foreclosed from considering" the mitigating evidence.  Johnson v. Texas, 509 U.S. 350, 368, 113 S. Ct. 2658, 2669 (1993).

In the sentencing phase, Nelson introduced evidence that (1) his mother rejected him; (2) he was intoxicated by drugs and alcohol when he committed the crime; (3) he had troubled relationships with his brother and women; and (4) he suffered from a treatable borderline personality disorder.[4]

In light of Tennard,[5] all of this evidence could be construed as mitigating, but only Nelson's evidence of borderline personality disorder arguably supports the second prong of his Penry I claim.

Nelson's evidence relating to his troubled interpersonal relationships and indifferent treatment by his mother is within the reach of the Texas punishment issues.  The state court reasonably

---

[4]    Nelson contends that evidence of his organic brain damage could not be fully considered by the jury within the scope of the special issues.  There is no such evidence.  The only record evidence of organic brain damage is a single sentence of testimony from an expert witness for the defense, stating "there is minimal room to consider that there may be minimal brain damage."  The expert, however, explicitly said that he could not make a formal diagnosis that Nelson in fact had brain damage.  He only suggested that if further medical examinations were performed, the existence of brain damage should not be ruled out prior to the exam. This evidence was not before the jury and can play no role in a Penry analysis.

[5]    See id. at 2570 (citing, New Jersey v. T.L.O., 469 U.S. at 345 ("[I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'") (quoting FED. RULE EVID. 401)).

6

distinguished Nelson's claim from Penry's evidence of severe physical abuse by his mother. The state court's decision is supported by longstanding precedent concerning similar — and more severe — claims of parental abuse and troubled interpersonal relationships. See Graham v. Collins, 506 U.S. 461, 476, 113 S. Ct. 892, 902 (1993) (concluding family background could be considered within the special issues); Cole v. Dretke, 418 F.3d 494 (5th Cir. 2005) (holding troubled childhood, including alcoholic parents who deserted the defendant, alcoholic grandparents who did not want to care for the defendant upon taking custody of him, and an isolated childhood punctuated by frequent changes in caretakers could be considered within the special issues); Lucas v. Johnson, 132 F.3d 1069, 1082-83 & n.8 (5th Cir. 1998) (traumatic childhood was within the effective reach of the jury under the first special issue, deliberateness); Drew v. Collins, 964 F.2d 411, 420 (5th Cir. 1992) (adverse effects of troubled childhood — including testimony that parents fought repeatedly, parents divorced and abandoned petitioner when he was very young, and petitioner was raised by his grandparents — could be considered under the special issues); Barnard v. Collins, 958 F.2d 634, 639 (5th Cir. 1992) (troubled childhood, including evidence that petitioner's father abandoned him from age four to age nine, was not Penry evidence absent proof these experiences had a psychological effect on the

7

petitioner).[6]  Specifically, when considering the first special issue, deliberateness, the jury could have given effect to Nelson's claims that his mother abandoned him, his parents divorced at a young age, and he never had a relationship with his own child.  All of these traumatic experiences might have countered the State's argument that Nelson "deliberately" murdered this victim; the jury simply disagreed.

As to Nelson's mitigation claim of voluntary intoxication, the state courts and federal district court correctly held that the special issues plainly allowed the jury to consider this evidence.  See West v. Johnson, 92 F.3d 1385, 1405 (5th Cir. 1996) ("As to the drinking and inference of intoxication, we have many times held that this may be adequately taken into account under both the first and second punishment issues (deliberateness and future dangerousness)."); Briddle v. Scott, 63 F.3d 364, 377 (5th Cir. 1995)("[E]vidence of intoxication may be considered as favorable to a negative answer to both the first and second punishment special issues, and hence is not Penry evidence.");[7] see also Graham v. Collins, 506 U.S. at 500, 113 S. Ct. at 915.

Turning finally to Nelson's evidence relating to a

_____

[6]    Lucas does not make any reference to, or rely upon, the tests rejected by the Supreme Court in Tennard.  Barnard and Drew do rely on our now-defunct "uniquely severe permanent handicap" test as to other claims, but in no way used this test in adjudicating the claims of parental neglect.  Therefore, the relevant aspects of Barnard and Drew are still controlling and support denial of Nelson's Penry claim concerning parental neglect.

[7]    None of these precedents makes any reference to, or rely upon, the tests rejected by the Supreme Court in Tennard.

8

borderline personality disorder, his expert characterized the disorder as one that causes Nelson's moods to shift from normal to depressed and anxious. Dr. Hickman, Nelson's expert, described Nelson's personality disorder as a psychological condition that caused his moods to go up and down between being normal and being depressed, anxious, and unsure of the reasons for his mood swings. Nelson responded to this condition by consuming alcohol and/or drugs. Significantly, Dr. Hickman testified that Nelson's disorder was treatable with medication and psychotherapy. This court's decisions undermine Nelson's claim that the jury was unable to give mitigating effect to this evidence. In Coble v. Dretke, 417 F.3d 508 (5th Cir. 2005), the court reiterated that "mitigating evidence of mental illness could be considered within the context of the second special issue, future dangerousness, if the illness can be controlled or go into remission." Id. at 524 (citing Lucas v. Johnson, 132 F.3d 1069, 1082-83 (5th Cir. 1998) and Robison v. Johnson, 151 F.3d 256, 266 (5th Cir. 1998)). Coble also distinguished a condition involving a treatable mental disorder from this court's Bigby decision, 402 F.3d at 571, in which medication could not control the defendant's schizophrenic behavior and thinking.[8] Nelson's treatable disorder is thus distinct from one that mandates

---

[8]    As in Coble, we need not speculate under what circumstances the first special issue, concerning a defendant's deliberateness in perpetrating the capital crime, will be inadequate to afford full mitigating effect to evidence of mental illness. Cf. Lucas, 132 F.3d at 1082-83; Bigby, 402 F.3d at 565-66.

9

relief under <u>Penry I</u>.[9]

Alternatively, we hold that Nelson's scanty evidence of borderline personality disorder falls within a qualification to the Court's reasoning in <u>Tennard</u>, which recognized that relevant mitigating evidence ultimately may be insufficient to warrant a sentence less than death if a reasonable jury could not so find based on all of the evidence in the case. <u>Tennard</u>, 124 S. Ct. at 2570;[10] <u>accord</u> <u>Bigby</u>, 402 F.3d at 567-69. Further, under <u>Tennard</u>, evidence of a trivial feature of the defendant's character or the circumstances of the crime unlikely to have any tendency to mitigate the defendant's culpability may be deemed irrelevant and inadmissible. <u>Tennard</u>, 124 S. Ct. at 2571. Nelson's evidence of borderline personality disorder was not "of such a character that it 'might serve as a basis for a sentence less than death.'" <u>Id.</u> (quoting <u>Skipper v. South Carolina</u>, 476 U.S. 1, 5, 106 S. Ct. 1669, 1671 (1986)). When juxtaposed with the significant aggravating evidence, the purported mitigating evidence of this condition and its effects could not reasonably provide a jury with sufficient reason to render a life sentence.

Based on the AEDPA standard and the nature of Nelson's

---

[9] We express no opinion on whether any allegation of mental disorder, no matter how nebulous, calls into question the sufficiency of the Texas special issues.

[10] The fact that an item of evidence is relevant, however, does not mean that it is sufficient to prove the fact of consequence to which it is directed. <u>See</u> FED. R. EVID. 401 ADVISORY C. NOTES ("'A brick is not a wall . . . It is not to be supposed that every witness can make a home run.'").

proffered evidence, we cannot say that the Court of Criminal Appeals unreasonably applied clearly established federal law in rejecting Nelson's Penry claim. Nelson points to no caselaw that the state courts failed to acknowledge, nor to any Supreme Court decisions that the courts unreasonably applied. Any analytical problems in this case were made by this court (and the federal district court following this court's precedent) in our previous, vacated decision. The Court of Criminal Appeals never relied on the now-defunct "constitutional relevance" test or its component parts, nor has our review of the complete record revealed any attempt by that court to place an elevated burden on Nelson for his claims. Equally important, all of Nelson's proffered mitigating evidence could be considered and given effect by the jury at sentencing within the context of the Texas punishment issues. Therefore, we affirm, albeit for different and additional reasons, the district court's denial of relief on this claim.

## CONCLUSION

With respect to all claims except Nelson's Penry claim, we reinstate our earlier decision (granting COA on the ineffective assistance claim and denying relief on the merits, and denying COA as to all other issues raised in Nelson's habeas petition). After a careful examination of Supreme Court precedent and additional briefing on Nelson's Penry I claim, we grant COA but find his argument lacking on the merits. The judgment of the district court

11

is **AFFIRMED.**

DENNIS, CIRCUIT JUDGE, CONCURRING IN THE JUDGMENT.

I agree with the judgment proposed by Chief Judge Jones' opinion, but because I cannot fully subscribe to either rationale given in the opinion, I respectfully concur in the judgment only for the following different reasons.

## I. Procedural Background

In <u>Nelson v. Cockrell</u>, 77 Fed. Appx. 209 (5th Cir. 2003), this panel granted Nelson's application for a COA on whether the special issues instruction used in the capital punishment sentencing proceeding failed to provide the jury with an adequate vehicle to give full consideration and effect to the defendant's mitigating evidence in violation of the Eight and Fourteenth Amendments as construed in <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989) (<u>Penry I</u>). After considering his appeal, this panel concluded that none of Nelson's evidence is incapable of being assessed and assigned full mitigating weight under the charge presented to his jury; and that the state court did not unreasonably apply clearly established federal law in rejecting Nelson's claim. <u>Nelson</u>, <u>supra</u>.[11]

---

[11] I concurred, considering myself bound by our en banc decision in <u>Robertson v. Cockrell</u>, 325 F.3d 243 (2003), but I noted that I adhered to my individual views expressed in my dissent filed in Robertson. <u>Id</u>.

13

In the reasons given for these conclusions, however, the panel did not discuss the state court decision or examine Penry v. Johnson, 532 U.S.782 (2001) (Penry II) or any other Supreme Court opinion. The panel's conclusions were based on threshold or screening rules created by decisions of this Circuit and largely collected in Robertson v. Cockrell, 325 F.3d 243 (5th Cir. 2003). Those rules were based on holdings by this court that substance addiction is not Penry-type evidence; that treatable mental disease, like borderline personality disorder, can be given full effect via the special issues; that non-extreme childhood abuse and neglect is not constitutionally relevant; and that evidence of possibility of brain damage without causal nexus to the crime is not constitutionally relevant. See Nelson, 77 Fed. Appx. at 213 (citing, inter alia, Robertson, supra; Graham v. Collins, 950 F.2d 1009 (5th Cir. 1992)).

The Supreme Court granted certiorari, vacated this panel's judgment and remanded the case to us for further consideration in light of Tennard v. Dretke, 542 U.S. 274 (2004). See Nelson v. Dretke, 542 U.S. 934 (2004).

The light shed by the Supreme Court's holding in Tennard includes the following: (1) The Fifth Circuit's threshold "constitutional relevance" tests have no foundation in the Supreme

14

Court's decisions. Relevant evidence is evidence that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence. This general standard of relevance applies in death penalty cases just as it does in other cases. <u>McKoy v. North Carolina</u>, 494 U.S. 433, 440-441 (1990). (2) Once this low relevance threshold is met, the Eighth Amendment requires that the jury must be able to consider and give effect to a capital defendant's mitigating evidence. <u>Id</u>. (quoting <u>Boyde v. California</u>, 494 U.S. 370, 377-378 (1990)). Impaired intellectual functioning has a mitigating dimension beyond the impact it has on the ability to act deliberately. <u>Id</u>.

As Chief Judge Jones correctly observes, because Nelson filed his federal habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that law govern the scope of our review. Specifically, 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. V) prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

15

United States." In <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000), the Court explained that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. A state court decision will be "contrary to" clearly established Supreme Court precedent if the state court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." <u>Id</u>. at 405-406. A state court decision will be an "unreasonable application of" the Supreme Court's clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." <u>Id</u>. at 407-408.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id</u>. at 409. Distinguishing between an unreasonable and an incorrect application of federal law, the Court clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is

16

also objectively unreasonable. Id. at 410-411.

Nelson's present Penry claim was adjudicated on the merits by the Texas Court of Criminal Appeals (CCA) on October 10, 2001. Thus, we must determine whether that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Because the CCA in that case denied habeas relief for the reasons found and recommended by the Texas district court, however, we must consider the district court's opinion as well as the record upon which the Texas courts based their decisions.

The meaning of the statutory phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 365. Therefore, to determine whether the pertinent state-court adjudication of Nelson's Penry claim "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States" we are guided not only by Penry I but also by all

17

other Supreme Court jurisprudence clearly established at the time of the CCA decision in this case.

## II. Overview

Although I agree with Chief Judge Jones that we must ultimately affirm the denial of habeas relief to Nelson, I believe that our duty under AEDPA requires a more intense initial focus on the CCA's decision, a more extensive search for the applicable federal law clearly established by the Supreme Court's decisions, and a thorough multi-step application of that clearly established Supreme Court jurisprudence, rather than Fifth Circuit cases, to the evidence and record in the present case. Further, we cannot determine the firmness, clarity and meaning of the pertinent legal principles by simply reading a few of the Supreme Court's opinions written just prior to the CCA's decision of October 10, 2001. To understand fully the meaning of the Court's language and holdings in capital punishment cases requires knowledge of the whole context and history of its post-Furman death penalty jurisprudence. For example, the concept of relevant mitigating evidence is used throughout this field by the Court without detailed definition of those terms in most cases. But this does not necessarily prevent us from finding that the general meaning

18

of relevant mitigating evidence in all cases was "established," "clear" and commonly understood even before F.R.E. 401's definition of "relevant evidence" was expressly endorsed in T.L.O.[12], McKoy, and Tennard. Nor must the Court re-explain the essential requisites of individualized sentencing in every capital case, or in respect to every state's death penalty system, in order for those requisites to be generally applicable as clearly established federal law. Thus, the fundamental principles of selecting only the most reprehensible of murderers for the death penalty according to individual comparative assessments of culpability do not become less established because they are often taken for granted rather than expressly iterated in every case. Legal principles and standards so well understood as to have become implicit or elliptical are not obsolete or any less binding.

For these reasons, it may be helpful in this and other Penry claim cases to identify separately the relevant principles and terms at issue and to determine the extent of the establishment and clarity of each at certain times in the death penalty jurisprudence, such as before and after Penry I (1989), before and after Penry II (June 4, 2001), and immediately before the CCA

_____

[12]    New Jersey v. T.L.O., 469 U.S. 325 (1985).

19

decision (October 10, 2001) in this case.  This may also help us understand better the meaning of the Court's opinions in those cases.  For this purpose, I will first set forth a summary of my understanding of the current pertinent clearly established principles of law regarding the death penalty.  Then, I will start at the beginning of the post-<u>Furman</u> era and proceed chronologically through the Court's cases expounding those principles.  Finally, of course, I will strive to arrive at the federal law clearly established by the Supreme Court at the time of the CCA's decision on October 10, 2001, and apply that law to the instant case.

### III.  Hypothesis of Principles
### of Clearly Established Federal Law

I tentatively assume that, when the CCA denied Nelson habeas relief on his <u>Penry</u> claim on October 10, 2001, federal law clearly established by the Supreme Court required a state to (1) empower[13] its capital sentencer to (a) give full consideration and effect to all of the defendant's relevant mitigating evidence; (b) make an individualized assessment of the level of the defendant's moral

---

[13]      By "empower" I mean that the State must clothe the capital sentencer with legitimate ability and authority to perform these functions. I do not mean that the state is required to instruct or specifically direct the sentencer to perform them. <u>See Buchanan v. Angelone</u>, 522 U.S. 269 (1998).

20

culpability or deathworthiness;[14] and (c) select the appropriate sentence of either life or death for each convicted defendant based on that assessment in light of all of the relevant evidence in the case; and (2) to refrain from interfering with the capital sentencer's proper use of those constitutionally protected powers.

## IV. Pre-<u>Penry I</u>

The capital punishment prerequisites of individualized sentencing based on the offender's level of culpability informed by consideration of all relevant mitigating evidence were established prior to <u>Penry I</u>. In the 1970's and early 1980's it was established that, because the death penalty is uniquely irrevocable, it must be reserved for the most morally depraved crimes committed by the most extremely culpable and deserving offenders, as determined by the capital sentencer after consideration of all of the defendant's mitigating evidence in light of the entire record. <u>See</u> <u>Roberts (Harry) v. Louisiana</u>, 431 U.S. 633 (1977); <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978); <u>Bell v.</u>

---

[14]    See Phyllis L. Crocker, <u>Concepts of Culpability and Deathworthiness</u>, 66 FORDHAM L. REV. 21, 35-36 (1997).("At the punishment phase, the concept of culpability stands as the benchmark for when the death penalty is an appropriate punishment.") As the author explains, "Deathworthiness" might be more appropriate so as to distinguish "culpability" for purposes of sentencing from "culpability" for purposes of the guilt determination. But as the Court has continued to use "culpability" to signify that which tends to make the defendant more or less deserving of the death penalty, I will also.

<u>Ohio</u>, 438 U.S. 637 (1978); <u>Green v. Georgia</u>, 442 U.S. 95 (1979); <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982) (all vacating death sentences where the sentencer did not consider all mitigating factors proffered by the defendant).

In <u>Woodson v. North Carolina</u>, the Court's plurality concluded that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. 280, 304 (1976). The mandatory death penalty statute in <u>Woodson</u> was held invalid because it permitted no consideration of "relevant facets of the character and record of the individual offender or the circumstances of the particular offense." <u>Id</u>. The Court further held that "an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978).

These principles of individualized sentencing, viz., full consideration of all relevant mitigating evidence, assessment of each offender's level of culpability, and sentence selection based

22

on that assessment, recognized by the <u>Woodson</u> and <u>Lockett</u> pluralities were adopted and firmly established by subsequent Supreme Court majorities.

A. Exempted Categories.

In certain kinds of cases, the Court held that the principles underlying capital punishment sentencing required that whole categories of crimes and offenders be exempted from eligibility for the death penalty because they presented an insufficient level of moral culpability to warrant the most extreme form of punishment. Prior to <u>Penry I</u>, the Court thus exempted murderers whose crimes reflect only minimal or ordinary moral depravity;[15] rapists of adult women;[16] murderer-accomplices who lack a sufficiently culpable state of mind;[17] and murderers who were under the age of 18 at the time of the crime.[18] Subsequent to <u>Penry I & II</u>, the court applied the same principles to exempt mentally retarded persons and offenders who were under the age of 16 at the

---

[15] <u>Atkins</u>, 536 U.S. at 305 (citing <u>Godfrey v. Georgia</u>, 446 U.S. 420, 433 (1980) (plurality opinion).

[16] <u>Coker v. Georgia</u>, 433 U.S. 584, 592 (1977).

[17] <u>Enmund v. Florida</u>, 458 U.S. 782, 801 (1982).

[18] <u>Roper</u>, <u>supra</u> (superseding <u>Thompson v. Oklahoma</u>, 487 U.S. 815, 838 (1988), prohibiting death penalty for murderers under 16 at the time of the crime (plurality opinion)).

time of the crime. <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002); <u>Roper v. Simmons</u>, 543 U.S. 551 (2005). Even dissenters who disagreed with categorical exemptions often expressed support for the constitutional requirement that the capital sentencer be empowered and allowed to select only those for the death penalty who were sufficiently culpable based on an individualized assessment of the mitigating evidence and the circumstances of each case.[19] This signifies a deep and abiding establishment of the principle of individualized capital sentencing on the basis of each offender's degree of culpability and full consideration of mitigation evidence.

B. Full consideration of all relevant mitigating evidence for the purpose of individualized assessment of culpability and sentence selection.

---

[19]     <u>Atkins</u>, 536 U.S. at 318; see also <u>id</u>. at 349-351 (stating that "only the sentencer can assess whether his retardation reduces his culpability enough to exempt him from the death penalty")(Scalia, J., Rehnquist, J., and Thomas, J., dissenting); <u>Roper</u>, 125 S. Ct. at 1224 (stating that "[i]n capital cases, this Court requires the sentencer to make an individualized determination, which includes weighing aggravating factors and mitigating factors")(Scalia, J., dissenting); <u>Thompson</u>, 487 U.S. at 870 (recognizing a constitutional trend towards "individualized sentencing determinations rather than automatic death sentences for certain crimes") (Scalia, J., Rehnquist, J., and White, J., dissenting); and <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 121 (1982) (interpreting <u>Lockett</u> as requiring an individualized consideration of mitigating circumstances) (Burger, J., White, J., Blackmun, J., and Rehnquist, J., dissenting).

24

In <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982), a majority of the Court applied <u>Lockett</u> to recognize that "justice ... requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender" and reversed the death penalty because "the sentencer in capital cases must be permitted to consider any relevant mitigating factor" and the trial judge had erred in finding as a matter of law that he could not consider the mitigating evidence of Eddings's violent family history. The Court observed that the common law has struggled with the problem of developing a capital punishment system that is "sensible to the uniqueness of the individual." <u>Id</u>. at 110.

## V. <u>Penry I</u>

A. <u>Penry I</u> clearly established or reaffirmed that a State must enable and allow its capital sentencer to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime. Thus, the special issues instruction as applied, because of the absence of an instruction that the jury could give that evidence effect by declining to impose the death penalty, was in conflict with the Eighth Amendment.

The Supreme Court in <u>Penry I</u> in 1989 reaffirmed the clearly established principles that a capital sentencer must be empowered to individually assess the culpability and just desert of each defendant and individually determine the appropriate sentence for him based on all the relevant mitigating evidence. The Court held that:

>  (1) at the time Penry's conviction became final, it was clear from <u>Lockett</u> and <u>Eddings</u> that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty. 492 U.S. at 318;

>  (2) [t]he rule Penry [sought]--that when such mitigating evidence [of his mental retardation and abused childhood] is presented, Texas juries must ... be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be

imposed--is not a 'new rule' under <u>Teague</u> because it is dictated by <u>Eddings</u> and <u>Lockett</u>. <u>Id</u>. at 318-19;

(3) "[u]nderlying <u>Lockett</u> and <u>Eddings</u> is the principle that punishment should be directly related to the personal culpability of the criminal defendant," <u>Id</u>. at 319;

(4) "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." <u>Id</u>;

(5) "In order to ensure reliability in the determination that death is the appropriate punishment in a specific case, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." <u>Id</u>. at 328; and

(6) therefore, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused [childhood] background by declining to impose the death penalty, ... the

27

jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision. <u>Id</u>. at 328. (internal quotations and citations omitted).[20]

---

[20] Thus, the Supreme Court in <u>Penry I</u> agreed with Penry's argument "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its reasoned moral response to that evidence in determining whether death was the appropriate punishment." <u>Id</u>. at 322. The Court explained in detail why it rejected the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the three special issues. <u>Id</u>.

In <u>Penry I</u>, the first special issue, which asked whether the defendant acted "deliberately and with the reasonable expectation that the death of the deceased ... would result," impermissibly limited the jury's function because the term "deliberately" had not been defined by the Texas Legislature, the Texas Court of Criminal Appeals, or the trial court's instructions. <u>Id</u>. at 322. Even if the jurors "understood 'deliberately' to mean something more than ... 'intentionally' committing murder, those jurors may still have been unable to give effect to Penry's mitigating evidence in answering the first special issue." <u>Id</u>. The reason was because "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." <u>Id</u>. at 323. Consequently, the Court concluded, unless there are "jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." <u>Id</u>. at 323. "Thus, we cannot be sure that the jury's answer to the first special issue reflected a reasoned moral response to Penry's mitigating evidence." <u>Id</u>. (internal quotation omitted).

The second special issue, which asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," permitted the jury to consider and give effect to Penry's mental retardation and childhood abuse as "relevant only as an aggravating factor...." <u>Id</u>. The second special issue was inadequate both because it only gave effect to Penry's evidence as an aggravating factor, and because it did not allow the jury to give full effect to Penry's mitigating evidence. <u>Id</u>. at 323. Thus, the Court concluded that Penry's evidence of mental retardation and childhood abuse was a "two-edged sword," diminishing "his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." <u>Id</u>. at 324.

28

B. The principle of relevance under Federal Rule of Evidence 401 applies in capital cases and cannot be distorted by the state so as to interfere with the sentencer's full consideration and use of relevant evidence in culpability assessment and sentence selection.

In McKoy v. North Carolina, 494 U.S. 433 (1990) the Court held that a state's capital sentencing scheme impermissibly limited jurors' consideration of mitigating evidence in violation of the Eighth Amendment where it declared irrelevant mitigating circumstances not found unanimously. Furthermore, the Court stated that its holdings in Skipper v. South Carolina, 476 U.S. 1 (1986), and Eddings, show that the mere declaration that evidence is "legally irrelevant" to mitigation cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death. The state's actions were held to impermissibly "distort[] the concept of relevance" because "[i]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' FED. R. EV. 401." McKoy, 494 U.S. at 440 (quoting T.L.O. 469 U.S. at 345 (1985)). Moreover, the Court made

29

clear that "[t]he meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding." Id.

C. States cannot limit the sentencer's full consideration of relevant mitigation factors.

Shortly after Penry I, well before the pertinent Texas CCA decision in this case, in Payne v. Tennessee, 501 U.S. 808, 824 (1991), Chief Justice Rehnquist, writing for a six-Justice majority, declared that "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." (citing McCleskey v. Kemp, 481 U.S. 279, 305-306 (1987)).

D. When there is a claim is that the challenged special issues instruction failed to enable and allow the jury to consider and give effect to relevant mitigating evidence, the proper inquiry is whether there is a reasonable likelihood that the jury has applied the instruction in a way that prevented the jury from giving consideration and effect to all of the defendant's relevant mitigating evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding does not violate the Eighth Amendment if there is only

30

a possibility of such an inhibition.

In <u>Boyde v. California</u>, 494 U.S. 370 (1990) the Court held that where the claim is that a challenged instruction is ambiguous and therefore subject to erroneous interpretation, the proper inquiry is whether there is a reasonable likelihood that the jury has applied the instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding does not violate the Eighth Amendment if there is only a possibility of such an inhibition. <u>Id</u>.

A few years later, the Court in <u>Johnson v. Texas</u>, 509 U.S. 350, 367 (1993), held that where the question is raised whether the Texas special issues allowed adequate consideration of the mitigating evidence of petitioner's youth, "the standard against which we assess whether jury instructions satisfy the rule of <u>Lockett</u> and <u>Eddings</u> was set forth in <u>Boyde v. California</u>, 494 U.S. 370 [] (1990). There we held that a reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' <u>Id</u> at 380

[]. Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar."

Thus, the Court in <u>Johnson</u> acknowledged that the special issues instruction had caused a possible constitutional violation and adopted the <u>Boyde</u> reasonable likelihood test for the purpose of determining whether a violation had indeed occurred. Further, the Court in <u>Johnson</u> applied the <u>Boyde</u> test and concluded that there was not a reasonable likelihood that the instruction had prevented a full consideration of the relevant mitigating evidence of Johnson's youth for the purpose of assessing his culpability. To support its conclusion the Court's majority opinion undertook an extensive analysis of the evidence in that particular case and demonstrated to its own satisfaction that the jury's mental process in considering the evidence for the purpose of answering the future dangerousness special issue was substantially the same as that of a jury which had considered the evidence for the purpose of assessing the defendant's culpability and selecting the appropriate sentence.[21]

---

[21]     Thus, the Court stated that answering the future dangerousness special issue "is not independent of an assessment of personal culpability", involving "the extent to which youth influenced the defendant's conduct."

32

In essence, the Court's majority indicated that the jury's consideration of the mitigating evidence in answering the special issue mimicked or served as a proxy for a consideration of the evidence for the purposes of assessing the defendant's culpability and selection of the appropriate sentence for him and his crime. For some jurists, this is a troublesome analysis or rationale, as evidenced by the strong dissent by four of the Justices.[22] Therefore, it is important to note that whether the special issue adequately mimicked a comparative culpability analysis in Johnson is largely a factual inquiry based on the character and propensities of the defendant and the circumstances of the crime

---

Johnson, 509 U.S. at 369. "If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness." Id. at 370. Consideration of the relevant qualities of petitioner's youth still "allow[s] the jury to give effect to [this] mitigating evidence in making the sentencing decision." Id. (internal citations omitted).

The jurors were required to "exercise a range of judgment and discretion." Id. (citing, Adams v. Texas, 448 U.S. 38, 46, 100 S.Ct. 2521, 2527, 65 L.Ed.2d 581 (1980). "[A] Texas capital jury deliberating over the Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in 'pure balancing' States." Id. at 370-371 (citing, Franklin v. Lynaugh, 487 U.S. 164, 182 (1988), n. 12 (plurality opinion)). "[T]he questions compel the jury to make a moral judgment about the severity of the crime and the defendant's culpability. The Texas statute directs the imposition of the death penalty only after the jury has decided that the defendant's actions were sufficiently egregious to warrant death." Id. at 371 (internal citations omitted). "[C]onsideration of the second special issue is a comprehensive inquiry that is more than a question of historical fact." Id.

[22]     See Johnson v. Texas, 509 U.S. 350, 375 (1993) (O'Connor, J., Blackmun, J., Stevens, J., and Souter, J., dissenting).

in that particular case.  The holding or legal rule of decision in Johnson, which is controlling and applicable to the present case for purposes of AEDPA, was simply that when the special issues instruction raises the question of whether the jury was precluded from considering and giving effect to the defendant's relevant mitigating evidence, the issue must be determined by applying the Boyde reasonable likelihood test.  The Court's subsequent straightforward application of the Boyde test in Penry II without reference to  Johnson or its extensive analysis of its facts corroborates this conclusion.

E. States cannot preclude or constrain the selection of sentence. States must empower and allow their capital sentencers to select the sentence.

Subsequent to Penry I but prior to the CCA decision in the present case, the Court in Buchanan v. Angelone, 522 U.S. 269, 276-77 (1998)  reaffirmed the principle that a state must empower and allow its capital sentencer to select either the death penalty or life imprisonment according to an individualized assessment of culpability level based on all of the defendant's relevant mitigating evidence.  Buchanan declared that "[i]n the selection phase, [Supreme Court] cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." Id.

34

at 276.  It also reaffirmed that states do not have an unhindered ability to create sentencing schemes as they see fit, and that to be constitutional they must not "preclude the jury from giving effect to any relevant mitigating evidence."[23] Id. The court also made clear that the appropriate standard for assessing the constitutionality of a jury instruction scheme is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. (quoting Boyde v. California, 494 U.S. 370 (1990)).  Finally, the Court distinguished Penry I from the facts of Buchanan, making clear that Penry I involved a Texas special issues scheme where the instructions "constrain[ed] the manner in which the jury was able to give effect to mitigation." 522 U.S. at 277.

VI. Penry II

---

[23]    See Roper v. Simmons, supra; see also Atkins, 536 U.S. at 352-53 (Scalia, J., dissenting): "Today's opinion adds one more to the long list of substantive and procedural requirements impeding imposition of the death penalty.... They include prohibition of the death penalty ...as the mandatory punishment for any crime, Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion), Sumner v. Shuman, 483 U.S. 66, 77-78 (1987); a requirement that the sentencer not be given unguided discretion, Furman v. Georgia, 408 U.S. 238 (1972) (per curiam), a requirement that the sentencer be empowered to take into account all mitigating circumstances, Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion), Eddings v. Oklahoma, supra, at 110; and a requirement that the accused receive a judicial evaluation of his claim of insanity before the sentence can be executed, Ford, 477 U.S., at 410-411 (plurality opinion)."

A. A Texas special issues jury instruction is unconstitutional if there is a reasonable likelihood it precluded the sentencer's full consideration or use of relevant mitigating evidence to assess the defendant's culpability or to select the appropriate sentence.

The Court in Penry II, in June 2001, reaffirmed its decision in Penry I and many of the foregoing clearly established principles of law. The Court held that, despite the state trial court's ineffectual attempt to fix the constitutional flaw pointed out in Penry I, the Texas special issues instruction still unconstitutionally prevented a sentencing jury from acting under the Eighth Amendment to individually assess the level of each offender's culpability and to choose whether to impose or withhold the death penalty based on that assessment. The Court reaffirmed that when a defendant has introduced relevant mitigating evidence, it creates a potential violation of the Eighth Amendment for a state by use of a preclusive or constraining jury instruction to interfere with the capital sentencer's giving full consideration and effect to  that evidence by using it to make an individualized assessment of the offender's culpability level and to select accordingly the appropriate sentence of death or life imprisonment for that defendant. The court made it clear, moreover, that it was enforcing its holding in Penry I which still meant the same thing it stood for in 1989.  The Court held:

36

Penry I did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under Penry I is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." 492 U.S. at 319 (emphasis added). See also Johnson v. Texas, 509 U.S. 350, 381, 113 S. Ct. 2658, 125 L.Ed.2d 290 (1993) (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," Penry I, 492 U.S. at 328, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence," Id. at 319 (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 305, 96 S. Ct. 2978, 49 L.Ed.2d 944 (1976)).

37

The Court in <u>Penry II</u> also reaffirmed and clearly established the requirement that, when the defendant introduces mitigating evidence relevant to the capital sentencer's assessment of the culpability of the defendant and the selection of the appropriate sentence, and the State's jury instruction may have precluded or constrained the sentencer's selection, the reviewing court must apply the <u>Boyde</u> reasonable likelihood test to determine whether there was an Eighth Amendment violation. <u>See Penry II</u>, 532 U.S. at 800. ("There is, at the very least, 'a reasonable likelihood that the jury ... applied the challenged instruction in a way that prevent[ed] the consideration' of Penry's mental retardation and childhood abuse. <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990). The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence.").

B. Because the Texas special issues instruction does not enable or permit the sentencer to select the appropriate sentence, the reasonable likelihood test must be applied by asking whether there is a reasonable likelihood that the instruction precluded the sentencer from considering relevant mitigating evidence or selecting the appropriate sentence.

In <u>Boyde v. California</u>, 494 U.S. 370 (1990) the Court held (1)that the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner. (citing <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978); <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982); and <u>Penry I</u>, 492 U.S. 302 (1989)) and (2) when it is claimed that a jury instruction is ambiguous and therefore subject to an erroneous interpretation, the proper inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. In <u>Boyde</u>, in which the Court first formulated the reasonable likelihood test for use in determining whether an ambiguous instruction had impermissibly limited the jury's consideration of the mitigating evidence, there was no contention that the instruction did not allow the sentencer to choose between life imprisonment and death as the appropriate sentence in the case; at issue in that case was only the antecedent question of whether the instruction had precluded the sentencer from fully considering all of the relevant mitigating

39

evidence in assessing culpability. Thus, although the Court declared repeatedly throughout the opinion that the Eighth Amendment requires that the jury be able to give effect, as well as consider, all relevant evidence, in its final analysis the Court focused on the specific issue in the case by asking, in essence, whether there was a reasonable likelihood that the jury was prevented from fully considering relevant mitigating evidence. There was no need or reason for the Court to inquire into whether the sentencer was precluded from giving full effect to the evidence by selecting what it considered to be the appropriate sentence.

Consequently, in a case in which the instruction arguably interfered directly with the sentencer's selection of the sentence as well as with its consideration of the relevant mitigating evidence, it is self-evident that the reviewing court must apply the reasonable likelihood test to each alleged error, i.e., it must ask whether there is a reasonable likelihood that the sentencer was precluded from (1) giving the evidence full consideration in assessing culpability or (2) giving the evidence full effect by selecting the sentence based on its assessment of culpability. Otherwise, its review of the assigned errors would not be complete and the defendant would have been unconstitutionally deprived of his right to have prejudicial error

40

corrected on review. See Estelle v. McGuire, 502 U.S. 62 (1991) ("In reviewing an ambiguous jury instruction ...we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.").

This reading of Chief Justice Rehnquist's opinion in Boyde is fully corroborated by his opinion for the Court in Buchanan. In Buchanan, although the Court held that a state is not required to affirmatively instruct juries in a particular way on the manner in which mitigation evidence is to be considered, the Court also made clear that while the state may shape and structure the jury's consideration of mitigation, it may not "preclude the jury from giving effect to any relevant mitigating evidence." 522 U.S. at 276 (citing Johnson, 509 U.S. at 362; Penry I, 492 U.S. at 326; Franklin, 487 U.S. at 181). "Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." Id. And the Chief Justice clearly contrasted Penry I as a case in which the Texas special issues constrained the manner in which the jury was able to give effect to the mitigation evidence by selecting the sentence. He stated:

The jury instruction [in Boyde] did not violate those constitutional principles. The instruction did not

41

foreclose the jury's consideration of any mitigating evidence. By directing the jury to base its decision on "all the evidence," the instruction afforded jurors an opportunity to consider mitigating evidence. The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they "may fix" the penalty at death, but directed that if they believed that all the evidence justified a lesser sentence then they "shall" impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved. Moreover, <u>in contrast to the Texas special issues scheme in question in Penry, supra, at 326, 109 S.Ct., at 2951, the instructions here did not constrain the manner in which the jury was able to give effect to mitigation</u>. <u>Id</u>. at 762 (footnote omitted)(emphasis added).

Thus, <u>Buchanan</u> strongly reaffirmed the holding of <u>Penry I</u> that the Texas special issue jury instruction failed to provide a constitutionally adequate vehicle for jurors to both consider the relevant mitigating evidence by assessing the defendant's culpability and give effect to that evidence by selecting the appropriate sentence for the defendant and his crime.

42

VII. Analysis

A. Texas Court of Criminal Appeals Decision

On October 10, 2001, the Texas Court of Criminal Appeals denied Nelson relief on his post conviction habeas claim, adopting the findings of fact and conclusions of law and recommendation of the Texas trial court that relief be denied.

The order of the state habeas trial court reflects, with respect to Nelson's Penry claim, that Nelson contended that he was denied his constitutional rights under the Texas Constitution and the Eighth and Fourteenth Amendments because Article 37.071 V.A.C.C.P. (1985) failed to ensure the consideration of mitigating evidence by the jury on punishment in the absence of jury instructions as to how mitigating evidence should be considered in answering the special punishment issues.

The state habeas trial court acknowledged that Nelson requested at trial that the court submit a special charge to the jury on mitigating evidence. The state habeas court acknowledged that in order for a death penalty procedure to meet the requirements of the Constitution of the United States, the death penalty procedure must allow the jury to consider all relevant

43

mitigating evidence, citing <u>Lockett v. Ohio</u>; that where the jury is unable to give effect in their verdict to mitigating evidence presented by the defendant in a capital case, the death penalty procedure is unconstitutional as applied to the defendant; and that where mitigating evidence presented by the defendant is beyond the scope of the special issues and the jury is thus unable to give effect to their reasonable moral response to that evidence in their verdict, the death penalty is unconstitutional as applied to the defendant, citing <u>Franklin v. Lynaugh</u>, 487 U.S. 164 (1988); <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989).

The state habeas trial court concluded that a jury is able to give effect to mitigating evidence of acts of kindness, compassion, and love through the special issue of whether there is a probability that the defendant would commit future acts of criminal violence, and thus such evidence is not beyond the scope of the special issues, citing only state cases; likewise, the court held that evidence that Nelson was a good worker; polite, kind, and helpful; respectful; and was someone who treated children well was not beyond the scope of the future violence special issue, and no additional instruction was needed, citing a state case. The court further concluded that evidence that Nelson was a hard worker who loses control only under the influence of alcohol and controlled substances does not reduce

blameworthiness and appears to be more aggravating then mitigating, with no citation of authority; the court noted that the trial court had instructed the jury to consider and give effect in answering each issue to your evaluation of all of the evidence and concluded that the jury charge and the special issues allowed the jury to give effect to all mitigating evidence in their answers including intoxication at the time of the offense, citing state cases; the court cited state court authority that voluntary intoxication has no mitigating significance beyond the scope of the special issues.

Nelson demonstrates from the record, however, that he introduced mitigating evidence he summarizes as follows:

> ...Dr. Hickman, the psychiatrist retained by petitioner, testified that he spent approximately six hours evaluating and testing petitioner. He testified that petitioner suffers from alcohol and cocaine addiction and has since the age of thirteen years. There is a realistic possibility that petitioner suffers from brain damage. Finally, Dr. Hickman testified that petitioner suffers from a Borderline Personality Disorder. According to Dr. Hickman, petitioner would function normally for seventy-five or eighty percent of the time, but will exhibit symptoms of the mental disorder at other times. Because of the mental illness, petitioner will "periodically go through an outburst of feelings which can become very violent, become very destructive. Not to others, mostly to themselves." Dr. Hickman testified this mental illness often renders a person unable to process how they are feeling and leads to drinking and drug behavior. In other words, this illness impacts on an

45

individual's ability to control their own impulses. Untreated, petitioner's illness has many dangers. But Dr. Hickman testified that petitioner's illness is treatable. In fact, Dr. Hickman suggested petitioner be treated for his alcohol and cocaine addiction in conjunction with the treatment for Borderline Personality Disorder. According to Dr. Hickman, if one problem is cured, the chances are improved for curing the other problem. Dr. Hickman recommended that petitioner receive incarceration and psychotherapy to learn to identify and process emotions. He further believes petitioner treatment will require medication. If petitioner is provided this treatment and circumstances, Dr. Hickman stated that the likelihood of future violent behavior "goes way, way down, if not eliminated." Petitioner's father testified that petitioner's mother did not accept him since his birth. Apparently she wanted a girl and was angry because petitioner was male. Petitioner attended several different schools. After his mother and father divorced and petitioner never completed school. His mother refused to take him with her. Petitioner later had a child in an unwedded relationship, but has been unable to maintain a relationship with his own child. Petitioner later became addicted to cocaine and alcohol. His father and family worked to help petitioner get past his drug addiction and petitioner's father thought they had done so. Indeed he was intent on helping petitioner with his alcohol addiction.

Before this offense petitioner was never convicted of a felony. On the day this occurred petitioner was drinking. His father knew petitioner was drinking heavily and was intoxicated. He also appeared to have relapsed and using cocaine. Mr. Nelson observed petitioner prior to his statements and thought petitioner's intoxication was obvious.


The State admits that Nelson introduced mitigating

evidence summarized as follows:

(1) Nelson was rejected by his mother.

(2) Nelson abused drugs and alcohol.

46

(3) Nelson has troubled relationships with his brother and with women. Nelson had an illegitimate child with a girlfriend; Nelson was not allowed to have a relationship with that child.

(4) A psychiatrist testified that Nelson had a drug and alcohol addiction problem and that he was suffering from a borderline personality disorder. The psychiatrist further testified that Nelson's personality disorder was treatable.

B. Parties' Arguments

Nelson contends that he introduced relevant mitigating evidence that could serve as a basis for a sentence of less than death, citing Skipper, 476 U.S. at 5-8, and that his rights were violated because there was no additional vehicle provided for the full consideration and full effect of his evidence as required by Penry I. Specifically, Nelson points to the testimony of a psychiatrist that Nelson suffered from an organic brain disorder, became violent and destructive because of his background, and needed intense psychotherapy.

The State responds by urging the reasons and authorities relied upon by the federal habeas district court for rejecting Nelson's arguments, citing Penry I and Johnson for the idea that

47

Nelson had not demonstrated that the proffered evidence was beyond the scope or the effective reach of the jury, and cites to a number of Fifth Circuit cases which have held that evidence similar to Nelson's is within the scope of the Texas special issues.

C. Rationales of Chief Judge Jones' Opinion

Chief Judge Jones' opinion would affirm the death penalty in this case on two alternate grounds: (1) that all of the mitigating evidence offered by Nelson was within the effective reach of the jury in arriving at its answers to the special issues; and (2) that only the evidence of Nelson's borderline personality disorder was not fully considered and given effect under the special issues, but that evidence was scanty and could not warrant a sentence less than death.

The first proposed holding, similar to that of our first panel opinion, does not undertake a fresh analysis; it simply applies prior Fifth Circuit decisions and concludes that all of Nelson's mitigating evidence was either not relevant or that it was given full consideration and full effect by the jury in answering the special issues. See Burgess v. Dretke, 350 F.3d 461, 469 (5th Cir. 2003) ("[W]e may grant relief only for a violation of 'clearly established' federal law ,as determined by the Supreme

48

Court of the United States. A decision by one of our sister circuits, even if compelling and well-reasoned, cannot satisfy the requirements under § 2254(d)(1)."(footnotes omitted)).

The second alternative proposed holding only partially undertakes the analysis required by Penry I & II and its progeny. It concludes, first, that substantially all of Nelson's mitigating evidence was relevant, but, second, that the special issues instruction only precluded the jury from giving full consideration and full effect to the mitigating evidence of Nelson's borderline personality disorder,[24] and, third, that the borderline personality

---

[24]    The only Supreme Court case cited by the opinion for this point is Graham v. Collins, a case involving family background evidence. 506 U.S. 461, 476 (1993). However, because of this case's procedural posture, it provides no support for the claim by the opinion that family background evidence is within the scope of the Texas special issues. Graham was a federal habeas corpus proceeding in which the Court concluded that the relief sought was not "'dictated by precedent'" and therefore not available on collateral review. 506 U.S. at 467; Brecht v. Abrahamson, 507 U.S. 619, 630 (1993) (holding that cases applying the Chapman rule on direct review were not binding through stare decisis on collateral review because of the differences between the two); Wright v. West, 505 U.S. 277, 292-93 (1992) (noting that "the notion that different standards should apply on direct and collateral review runs throughout our recent habeas jurisprudence"). Graham is therefore inapplicable here because cases on collateral review that reject a claim as requiring a new rule are, at best, persuasive authority on direct review. Johnson, 509 U.S. at 366. In fact, the Graham opinion is explicit on this point. The Graham Court was limited by the Teague rule against announcing new principles of constitutional law on collateral review. Graham, 506 U.S. at 466-67; see also Teague v. Lane, 489 U.S. 288 (1989). The primary focus of the Court's inquiry in Graham was on whether reasonable jurists could agree that Penry I dictated the relief sought by Graham and was thus an existing principle of constitutional law. Graham, 506 U.S. at 476. The Graham Court expressly avoided making any holdings on the interpretation of Penry I. In Graham, "the determinative question [was] whether reasonable jurists reading the case law that existed in 1984 could have concluded that Graham's sentencing was *not* constitutionally infirm." Dicta aside, the Court made an extremely narrow holding - it decided the case on the grounds that it "cannot say that all reasonable jurists would have deemed themselves compelled to accept Graham's claim in 1984." Id. As discussed above, the case law in this area has

49

disorder evidence was so scanty and insufficient that a reasonable jury could not have found that a sentence less than death was warranted based on all of the evidence in the case.

This analysis only partially acknowledges and applies the relevance analysis required by Penry I & II; it does not fully inform itself of the applicable federal law clearly established by the Supreme Court's jurisprudence or fully analyze the pertinent state court decision to determine whether it is contrary to or an unreasonable application of that law. Although the Chief Judge's opinion arrives at the correct judgment in this case, I believe that AEDPA requires a more extensive analysis. Accordingly, I will set forth what I believe to be the correct appreciation of the federal law clearly established at the time of the CCA's decision and apply it to the CCA decision and ultimately to the record in this case.

D. Clearly Established Federal Law

1. Pertinent Clearly Established Federal Law

The foregoing survey confirms that, when the CCA denied Nelson habeas relief on his Penry claim on October 10, 2001,

---

changed significantly in the years since 1984. The limited decision in Graham has no relevance to the current state of Supreme Court law.

50

federal law clearly established by the Supreme Court required a state to (1) empower its capital sentencer to (a) give full consideration and effect to all of the defendant's relevant mitigating evidence; (b) make an individualized assessment of the level of the defendant's moral culpability and deathworthiness; and (c) select the appropriate sentence of either life imprisonment or death for each convicted defendant based on that assessment in light of all of the relevant evidence in the case; and (2) refrain from interfering with the capital sentencer's performance of this constitutionally protected function.

Before the time of the CCA's decision on October 10, 2001, the Supreme Court in 1989 in <u>Penry I</u> had clearly established that underlying <u>Lockett</u> and <u>Eddings</u> is the principle that punishment should be directly related to the personal culpability of the criminal defendant; and that in order for the sentencer to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant. <u>Penry I</u>, 492 U.S. at 319. Moreover, the <u>Penry I</u> court decided that <u>Eddings</u> had made clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. <u>Id.</u> (citing <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987)). Only then can the

51

courts be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence. Id. (citing Woodson, 428 U.S. at 304, 305). Indeed, the Court in Penry I held, "it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." Id. at 327-328. Further, the Court in Penry I established that, "in order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,' the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." Id. at 328 (citing Woodson, 428 U.S. at 305). Consequently, the Court clearly established that under the Texas special issues instruction:

> "in the absence of additional instructions informing the jury that it could consider and give effect to the defendant's relevant evidence by declining to impose the death penalty, ... the jury was not provided with a vehicle for expressing its reasoned moral response to that evidence in rendering its sentencing decision, and [the federal law previously clearly established by Lockett and Eddings] thus compels a remand for resentencing so that we do not risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."

52

> *Id.* (citing <u>Lockett</u>, 438 U.S. at 605; <u>Eddings</u>, 455
> U.S. at 119).

In 1990 the Supreme Court in <u>McKoy v. North Carolina</u>, 494 U.S. 433, 440 (1990), made it clearly established, if it had not been before, that the meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard – "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'" applies. (quoting <u>New Jersey v. T.L. O.</u>, 469 U.S. 325 (1985); paraphrasing and citing Federal Rule of Evidence 401 in a Fourth Amendment case). Further, the Court in <u>McKoy</u> also clearly established that the Constitution requires States to allow consideration of mitigating evidence in capital cases, and any barrier to such consideration must therefore fall. <u>Id</u>. at 442-43 (citing and quoting <u>Mills v. Maryland</u>, 486 U.S. at 375). Finally, the Court in <u>McKoy</u> established that its holdings in <u>Skipper</u> and <u>Eddings</u>, show that the mere declaration that evidence is "legally irrelevant" to mitigation cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death; and that the meaning of relevance is no different in the context of mitigating evidence introduced in

53

a capital sentencing proceeding.

Also in 1990, the Court in <u>Boyde v. California</u>, 494 U.S. 370 (1990), reaffirmed the clearly established principle that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." <u>Id</u>. at 382. Further, in <u>Boyde</u>, the Supreme Court reaffirmed the clearly established principle that when the defendant introduces relevant mitigating evidence, the Eighth Amendment requires that the jury be able to consider and give effect to that mitigating evidence. <u>Id.</u> at 285 (citing <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978); <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982); <u>Penry I</u>, 492 U.S. 302 (1989).

On June 4, 2001, some four months prior to the CCA's decision, the Supreme Court, in <u>Penry II</u>, made the principles clearly established by its decision in <u>Penry I</u>, even more firm and clear:

> <u>Penry I</u> did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under <u>Penry I</u> is that the jury be able to "consider and give effect to [a defendant's mitigating] evidence in imposing sentence." 492 U.S.,

54

at 319, 109 S.Ct. 2934 (emphasis added). See also Johnson v. Texas, 509 U.S. 350, 381, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances" (emphasis in original)).

For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," Penry I, 492 U.S., at 328, 109 S.Ct. 2934, that we can be sure that the jury has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence. Id. at 319, 109 S.Ct. 2934 (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 305 (1976)).

In 1991, in Payne v. Tennessee, 501 U.S. 808, 824 (1991) the Court declared that "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." Id. (citing McCleskey v. Kemp, 481 U.S. 279, 305-306 (1987): "[b]eyond these limitations ... the Court has deferred to the State's choice of substantive factors relevant States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. California v. Ramos,

55

463 U.S. 992, 1001, 103 S.Ct. 3446, 3453, 77 L.Ed.2d 1171 (1983).").

In 1998, in <u>Buchanan v. Angelone</u>, 522 U.S. at 276-277, the Court reaffirmed the clearly established principle that the capital sentencer may not be precluded from giving effect to relevant mitigating evidence by selecting the appropriate sentence; and that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. <u>Id</u>. (citing <u>Penry v. Lynaugh</u>, 492 U.S. 302, 317-318 (1989); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 113-114 (1982); <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978)).

2. Applying Clearly Established Principles of Federal Law

Applying the foregoing clearly established principles of federal law, I conclude that the Texas special issues instruction caused at least two potential constitutional violations under the federal law clearly established by the Supreme Court's cases.[25] Each of these potential violations has been described in more than one way or level of depth by the Supreme Court's cases. Under the most often repeated analysis and language of <u>Penry I</u> and its

---

[25] I call them "potential" violations because even though they appear to be clear breaches of the constitutional requirements imposed on the State, a reviewing court is required to apply the <u>Boyde</u> reasonable likelihood test to determine if there was a true or actual violation.

progeny, the special issues instruction violated Nelson's constitutional rights by precluding the jury from fully considering and fully giving effect to Nelson's relevant mitigating evidence. Furthermore, the fundamental significance of that lack of full consideration and full effect is also described in Penry I and other Supreme Court cases as follows: the special issues instruction potentially violated clearly established federal law protecting Nelson's rights by precluding the jury from fully considering his relevant mitigating evidence in assessing his culpability and in selecting the appropriate sentence on the basis of that assessment and all of the record evidence. Thus, the violations also may be described and discussed as the State's failure under clearly established federal law to enable and allow the jury to consider and use the relevant mitigating evidence for the purpose of assessing Nelson's culpability and selecting the appropriate individualized sentence for him and his crime.

Each of the violations stems from the reality that under the Texas special issues instruction the jury was only enabled to consider the mitigating evidence for the purpose of answering the special issues interrogatories as to whether Nelson's crime was deliberate and whether he will be dangerous in the future. Much less than being enabled and allowed to give full effect to

57

Nelson's mitigation evidence, his jury was authorized to give very limited effect to it because the jury was not enabled or allowed to select the appropriate sentence. Because the jury lacked the ability to select the sentence, there was no reason for it to assess or even advert to the degree of Nelson's culpability as compared to other murderers. In other words, because the jury was only called upon to answer two relatively simple yes or no questions, there is no reason to suppose that it could or would consider the evidence for the complex purpose of assessing the comparative level of Nelson's culpability. Under the special issue instruction the jury is in a position similar to that of a voter who is allowed to consider the candidates but not allowed to vote. Neither the voter nor the jury is realistically able to consider the evidence for the purpose of making the choice in which they are not allowed to participate. In sum, Nelson's jurors were allowed to give the mitigation evidence only the restricted effect of answering the special issues, not the full effect of selecting the appropriate sentence; thus it cannot honestly be assumed that the jury was realistically able to give the evidence more than the limited consideration necessary for that purpose, not the full consideration that jurors would have given it had they been empowered and allowed to select the appropriate sentence.

58

Each of the arguments that have been presented by the State for upholding a death penalty that was not selected by the capital sentencer based on the sentencer's assessment of the defendant's culpability conflicts with the clearly established principles of federal law and in the final analysis simply begs the question. When the capital sentencer cannot and does not knowingly choose the sentence based on its assessment of the defendant's culpability the sentencing process is contrary to the clearly established requirements of individualized sentencing in which the sentencer must be enabled and allowed to select the appropriate sentence on the basis of the sentencer's assessment of the defendant's culpability informed by a full consideration of all of the defendant's relevant mitigating evidence. When the arguments or reasons for avoiding this conclusion are carefully analyzed, they usually reveal themselves as some form of question begging; that is, they either assume a desired alternate conclusion as part of the reason for preferring it or they assume a new rule of law that requires the desired result. In the Penry claim cases the circular arguments to the effect that the defendant's relevant mitigating evidence could be reached by or were within the scope of the special issues, when stripped of pretenses of logic and non-sequiturs, are built on the desired conclusion itself, viz., that the special issues instruction

59

provided a constitutionally adequate vehicle for individualized sentencing, are devoid of logical demonstration based on concrete evidence. In the _Penry_ cases also, the state and federal appellate courts have created threshold and screening rules, such as the unique severity and nexus rules or constitutional relevance rule, which serve to cut off appellate review and avoid the difficulty of confronting whether a fully enabled capital sentencer, rather than a sentencer in name only, would have selected the death penalty had it been authorized to choose between that and a life imprisonment sentence. These arguments and rules are contrary to the clearly established jurisprudence of the Supreme Court prevailing well before the CCA's decision in this case. As noted earlier in this opinion, the Court in _McKoy_ clearly established as early as 1990 that states cannot distort or skew the principle of relevance underlying Federal Rule of Evidence 401 to limit the introduction, consideration and use of relevant mitigating evidence in capital cases. The Supreme Court has never approved mere specious, circular arguments as justification for concluding that the special issues reached or fully accommodated a defendant's relevant mitigating evidence. For example, the Court in _Johnson_ upheld a death penalty obtained under the special issue instruction, but it did not do so on the basis or a screening rule or conclusory or circular reasoning.

60

Instead, the Court first indicated that the special issue instruction had raised the issue of whether there had been a constitutional violation. Then, the Court in <u>Johnson</u> adopted and applied the <u>Boyde</u> reasonable likelihood test to the record in the case to determine if in reality there had been an Eighth Amendment transgression. The Court went to great lengths to demonstrate rationally that the jurors' mental process in deciding the answer to the special issues instruction mimicked or was sufficiently similar to that of a reasonable jury's culpability assessment so that there was not a reasonable likelihood that the special issue instruction had caused an Eighth Amendment violation.

In this case, the State was required to enable and allow the capital sentencing jury to fully consider and give full effect to all of Nelson's relevant mitigating evidence. Under the Supreme Court's clearly established jurisprudence the sentencing jury must be able to consider fully all of the defendant's mitigating evidence, assess his level of culpability and just desert, and select the appropriate sentence of life imprisonment or death based on that assessment. The Court's cases also clearly establish that according to the general principle of relevance underlying the Federal Rules of Evidence, relevant evidence is any evidence that tends to make a matter of consequence to the outcome of the action more or less likely than it would be without that evidence.

61

In a capital sentencing proceeding the level of the defendant's culpability or deathworthiness is a matter of consequence to the outcome of the case because  if the capital sentencer should be persuaded that the defendant's culpability is sufficiently diminished the sentencer will be more likely to select life imprisonment rather than the death penalty as the appropriate sentence for that defendant.  Nelson introduced  mitigating evidence consisting of a psychiatrist's testimony that he suffered from a borderline personality disorder and drug and alcohol addiction; evidence of abandonment by his mother at a young age, his troubled relationships with women and his brother, and his not being allowed to have a relationship with his illegitimate child. Each item of this evidence was relevant and had at least some mitigating value because each item tended to make more likely than would have been the case without it that the jurors would find that Nelson's level of culpability was lower than that of a similarly situated normal person. Under F.R.E. 401 and the universally accepted principle of relevance, it does not matter whether one item alone could persuade a reasonable juror to vote to impose a sentence of less than death.  It is sufficient for purposes of having the jurors consider and possibly give effect to that evidence that it has a tendency to mitigate the defendant's culpability in the eyes of the jurors.

62

The State, its legislature or its courts, or a combination of them, did not comply with the requirements imposed by the constitution to regulate the administration of the death penalty in accordance with the clearly established jurisprudence of the Supreme Court. The capital sentencer, the jury in this case, was not enabled to fully consider and to give full effect to Nelson's relevant mitigating evidence. Although, the jury was permitted to hear and see the evidence, it was allowed to consider the evidence only for the purpose of answering the two special issues, viz., was the murder deliberate; and will the defendant be a danger to society in the future. Thus, the jury was neither enabled or allowed to fully consider the evidence for the purposes of performing the constitutionally protected functions of individualized sentencing; its consideration of the evidence was authorized and allowed only for a highly limited purpose. Likewise, the jury was not authorized or allowed to give full effect to the evidence because that would have required that the jury be allowed to assess the level of culpability of the defendant and to select the appropriate penalty based on that assessment.

A state court's ruling constitutes an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably

63

to the facts of a particular prisoner's case." <u>Williams</u>, 529 U.S. at 407-08. Here, the state district court correctly identified the holdings in <u>Penry I</u> and its progeny as supplying the clearly established federal law that governs this case.  That is, the state court's conclusion of law, which the CCA adopted, acknowledged that <u>Penry I</u> required a State to enable its capital sentencing jury to fully consider and fully give effect to all of the defendant's relevant mitigating evidence. But that court then applied that federal law unreasonably by ruling that the special issues instruction given in Nelson's case, which was substantially the same as that used in <u>Penry I</u>, allowed the jury to fully consider and fully give effect to all of Nelson's relevant mitigating evidence. For the reasons given earlier in detail, it was objectively unreasonable for the Texas court to conclude that the special issues instruction enabled or allowed the sentencing jury to give full consideration and full effect to Nelson's relevant mitigating evidence. The special issues instruction did not empower or permit the jury to give any consideration to that evidence for the purpose of assessing Nelson's culpability or his deathworthiness, and it did not enable or allow the jury to give any effect to that evidence by selecting the sentence to be imposed according to that assessment and all of the evidence in the case.

64

3. Applying the Boyde Reasonable Likelihood Test

Under the federal law clearly established by the Supreme Court's decisions in Penry I, McKoy, Boyde, Penry II and Buchanan, and others, when a capital sentencing jury is given an instruction that may have precluded or constrained it from giving full consideration or effect to the defendant's relevant mitigating evidence, we are required to apply the reasonable likelihood test to determine whether an Eighth Amendment violation occurred. For the reasons explained earlier in this opinion, because of the deficiency peculiar to the pre-1991 Texas special issues instruction, that is, the absence of the capital sentencer's ability to make its own choice in selecting the appropriate sentence, there is a significant possibility that two violations occurred, that is, that the jury was not enabled or allowed to either fully consider the relevant mitigating evidence for the purpose of assessing culpability or fully give effect to the mitigating evidence by selecting the appropriate sentence. Accordingly, this court is required to determine whether there is a reasonable likelihood that the special issue instruction had either effect. In my opinion, it is plain that there is not merely a reasonable likelihood but a certainty that the jury was precluded from fully performing both functions. The jurors were

65

simply not enabled or allowed to select a sentence of life imprisonment or death on the basis of their assessment of the defendant's culpability, and, correspondingly, the jurors were not enabled or allowed to consider the mitigating evidence for the purpose of comparatively assessing the defendant's culpability because the special issues instruction did not assign them any task or function that realistically required that assessment. Consequently, I must conclude that Nelson's rights under the Eighth and Fourteenth Amendments as clearly established by the Supreme Court's decisions were abridged.

4. Applying the <u>Brecht</u> Harmless Error Test

Although the special issues jury instruction violated Nelson's rights under the Eighth and Fourteenth Amendments according to federal law clearly established by the Supreme Court's cases, that error would justify overturning Nelson's sentence only if Nelson could establish that the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946)). And the Supreme Court further admonished:

> This standard reflects the "presumption of finality and legality" that attaches to a conviction at the conclusion of direct review. 507 U.S., at 633, 113

S.Ct. 1710. It protects the State's sovereign interest in punishing offenders and its "good-faith attempts to honor constitutional rights," id., at 635, 113 S.Ct. 1710, while ensuring that the extraordinary remedy of habeas corpus is available to those " 'whom society has grievously wronged,' " id., at 634, 113 S.Ct. 1710 (quoting <u>Fay v. Noia</u>, 372 U.S. 391, 440-441, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)).

A federal court upsets this careful balance when it sets aside a state-court conviction or sentence without first determining that the error had a substantial and injurious effect on the jury's verdict. The social costs of retrial or resentencing are significant, and the attendant difficulties are acute in cases such as this one, where the original sentencing hearing took place in November 1981, some 17 years ago. No. C89-1906, App. to Pet. for Cert. A-101, n. 45. The State is not to be put to this arduous task based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error. <u>Brecht</u>, supra, at 637, 113 S.Ct. 1710. As a consequence, once the Court of Appeals determined that the giving of the Briggs instruction was constitutional error, it was bound to apply the harmless-error analysis mandated by <u>Brecht</u>.

<u>Calderon v. Coleman</u>, 525 U.S. 141 (1998).

Considering the gravity of the Supreme Court's admonitions, we must take into careful consideration the likely effect that Nelson's crimes as well as his mitigating evidence may have had if the jury had been empowered to give full consideration and full effect to all of the evidence. Nelson's crimes were unprovoked, uninvited, inexcusable, and incomprehensible. Nelson murdered Charla M. Wheat and attempted to murder Wheat's roommate Carol Maynard in their home on the night of February 23, 1991. Mrs.

67

Maynard, whose husband was in the armed forces in Saudi Arabia during Desert Storm, was 20 years old and 5 months pregnant. Ms. Wheat was 18 years old and single. Nelson lived across the street with his common law wife. In one of his confessions which was introduced into evidence he said he was "skitzing" on cocaine and that he went over to their house in the early morning hours "to get a piece of ass." When he arrived, Mrs. Maynard had gone to bed but Ms. Wheat was in the living room awaiting a phone call from her boyfriend. He asked to use the phone and Ms. Wheat let him in. As she was bending over to get the phone he grabbed her, pulled out a knife and cut the phone cord. She screamed and he either knocked her to the floor or stabbed her, or both. He went to the bedroom, grabbed Mrs. Maynard and walked her to the living room. He forced the women to disrobe, lie on the floor and perform oral sex on each other. Sometime before this, he said, he made Ms. Wheat lick his testicles. Then, in his confession, he said, "When I saw the girls down on the ground nude, I lost it and I started stabbing the girls." According to Mrs. Maynard's testimony, after Nelson had stabbed them and was heading for the front door, Ms. Wheat screamed, causing him to return. Mrs. Maynard escaped additional harm by feigning death or unconsciousness. He stabbed Ms. Wheat several more times and she ultimately died from her wounds. Then Nelson went back to his house across the street,

68

disposed of his bloody knife and clothes, took a shower and relaxed under a blanket on the couch. The police soon found him there and extracted a series of confessions.

Nelson did not testify at the guilt or punishment phases of his trial  or offer any excuse for his crimes other than saying, in his confessions, that he had argued with his wife and only went across the street with the intention of having sex with the women, not of hurting them.  His other mitigating evidence does not arouse great sympathy: His psychiatrist testified that he  suffers from alcohol and drug addiction and abuse, possible  brain damage and treatable borderline personality disorder.  He is peaceable and not prone to violence, however, except occasionally when he is intoxicated or on drugs. Otherwise he is law abiding, hard working and gregarious with children. His mother rejected or abandoned him at a young age. He lived with his father and his second family, who discouraged his association with his maternal relatives. He has troubled relationships with his brother and women in general. He has an illegitimate child by a former girlfriend but has not been allowed to associate with the child. Prior to these crimes he had not been convicted of a felony, but there was evidence that he was periodically susceptible to episodes of violence.

Nelson's psychiatrist testified that Nelson suffers from a

Borderline Personality Disorder. According to the doctor, Nelson will function normally for 75% to 80% of the time, but will exhibit symptoms of mental disorder at other times. Because of the mental illness, petitioner will periodically go through an outburst of feelings which can become very violent, become very destructive. It is possible that both his alcohol and drug addiction and his borderline personality disorder can be treated and controlled with medication and medical care.

Considering the merciless depravity of Nelson's crimes and the lack of poignancy and excusatory effect of his mitigation evidence, I have considerable doubt that the State's failure to enable and allow his jury to give full consideration and full effect to his relevant mitigating evidence had a "substantial and injurious effect" on the verdict. Brecht v. Abrahamson, supra, at 637. Accordingly, I agree that we should not disturb the Texas Court of Criminal Appeals' rejection of Nelson's Eighth Amendment claim.

For these reasons, I respectfully concur in the judgment only.